Li Yu*
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Tel. (646) 933-1000
lyu@dicellolevitt.com

Adam J. Levitt (Ariz. Bar. No. 038655)
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel. (312) 214-7900
alevitt@dicellolevitt.com

Peter C. Soldato*
Joseph Frate*
**DiCELLO LEVITT LLP**
8160 Norton Parkway
Mentor, Ohio 44060
Tel. (440) 953-8888
psoldato@dicellolevitt.com
jfrate@dicellolevitt.com

*Pro Hac Vice* Admission Pending

Christopher J. Bryant*
Eric Rothchild*
**NATIONAL STUDENT LEGAL
DEFENSE NETWORK**
1701 Rhode Island Avenue NW
Washington, DC 20036
Tel. 202-734-7495
Chris@defendstudents.org
Eric@defendstudents.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TANNER SMITH and QIMIN WANG, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>GRAND CANYON EDUCATION, INC.,<br><br>    Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Tanner Smith ("Smith") and Qimin Wang ("Wang") (collectively, "Plaintiffs"), individually and on behalf of the other members of the below-defined classes they seek to represent (the "Class," or the "Classes"), hereby allege against defendant, Grand Canyon Education, Inc. ("GCE" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon investigation of counsel, as follows:

## I.    NATURE OF THE ACTION

1.     Since at least January 1, 2017, GCE has orchestrated a racketeering scheme to induce students—including Plaintiffs and the other Class members—to enroll in doctoral degree programs at Grand Canyon University, which has been controlled by GCE, by lying to students about how much they would need to pay to obtain their doctoral degrees from Grand Canyon University.

2.     Both federal law and regulations promulgated by the U.S. Department of Education ("ED") require GCE, which had an exclusive agreement with Grand Canyon University to provide marketing and student recruitment, to give prospective students accurate information as to the true cost of the doctoral programs at Grand Canyon University.[1] Yet, GCE lied about doctoral program costs—repeatedly and persistently—to students like Plaintiffs and the other Class members.

3.     Throughout the Class Period—January 1, 2017, to the present—GCE has propagated false information about the true cost of Grand Canyon University's doctoral programs in a variety of ways: on the Grand Canyon University website, through marketing materials sent by mail and email by GCE's sales representatives, and in enrollment applications and agreements.

---

[1]    *See* 20 U.S.C. § 1092(a)(1)(E) (requiring accurate description of, among other things, "tuition and fees"); *see also* 34 C.F.R. §§ 688.71-73 (prohibiting both educational institutions and any "person with whom the [] institution has an agreement to … provide marketing, advertising, recruiting or admissions services" from making any "false, erroneous or misleading statement" regarding, as relevant here, the "cost of the program" and the "requirements for successfully completing the course of study").

4.    Through those methods, GCE falsely told prospective students like Plaintiffs and the other Class members that they could obtain their doctoral degrees by paying a total tuition amount equal to 60 or 65 times the cost per credit.

5.    For example, in July 2018, GCE informed Plaintiff Smith that the "estimated tuition" for him to complete a Ph.D. in General Psychology was $39,000, *i.e.*, 60 credits x $650 per credit. Similarly, in March 2019, GCE informed Plaintiff Wang that the "estimated tuition" for her to complete a Doctor of Education degree in Organizational Leadership was $39,000, i.e., 60 credits x $650 per credit. GCE also falsely told prospective students like Plaintiff and the other Class members that the "total estimated cost" of their degree will be the estimated tuition plus three specifically itemized fees. *See infra* ¶¶ 44–47, 89–97, 114–120.

6.    In truth, however, since at least January 2017, senior executives at GCE—including Michael Berger, who has served as the Dean of the College of Doctoral Studies—have known that almost none of the students at Grand Canyon University completed their doctoral degrees with just 60 credits (or 65 credits for two doctoral programs) and that artificial bottlenecks in the doctoral dissertation process created by GCE's doctoral program policies and practices required at least 70% of doctoral students to pay thousands of dollars—and often tens of thousands of dollars—more in tuition for "continuation courses." *See infra* ¶¶ 49–62.

7.    In Plaintiff Smith's case, GCE required him to pay more than $8,400 in additional tuition for four "continuation courses" after he had already paid for all 60 credits that he expected to pay to complete his Ph.D. in General Psychology. In Plaintiff Wang's case, GCE has required her to pay almost $8,700 in additional tuition for four continuation courses after she completed all 60 credits towards her Doctor of Education degree in Organizational Leadership and may require her to pay for yet more continuation courses to complete that degree.

8.    In October 31, 2023, the Office of Federal Student Aid ("FSA") at ED announced a $37.7 million fine against Grand Canyon University after an "FSA investigation found GCU lied to more than 7,500 former and current students about the cost of its doctoral programs over several years," including by "falsely advertis[ing] a lower cost than what 98% of students ended

up paying to complete certain doctoral programs."[2] Attached as Exhibit 1 to this Complaint is a copy of a letter dated October 31, 2023, from ED to Grand Canyon University setting forth the basis for the fine.

9.      To orchestrate and profit from this fraud scheme, GCE exploited its control over Grand Canyon University. Specifically, to facilitate its aggressive recruiting efforts directed at prospective students like Plaintiff, GCE used the proceeds of its fraud scheme to establish Grand Canyon University as a nominally independent, not-for-profit entity in July 2018. Beneath the veneer of nominal independence, however, GCE continued to control Grand Canyon University and to use it as a RICO enterprise for carrying out GCE's fraud scheme against doctoral students. *See infra* ¶¶ 63–87. (Attached as Exhibit 2 to this Complaint is a copy of a letter from ED, dated November 6, 2019, concluding that the nominally independent Grand Canyon University "does not satisfy the Department's definition of a nonprofit" due to the extent of GCE's control).

10.     During the Class Period, GCE reaped millions of dollars a year in profits from this fraud scheme, in violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), California consumer protection statutes like the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA"), and the West Virginia Consumer Credit and Protection Act, 46A W. Va. Stat. §§ 6-101, *et seq*. ("W. Va. Consumer Protection Law").

11.     For thousands of students like Plaintiffs and the other Class members, who enrolled in doctoral programs with dissertation requirements at Grand Canyon University, GCE's fraud caused them collectively to incur tens of millions of dollars in losses as result of either having to pay more to obtain doctoral degrees or, for many of them, having to leave those programs without ever graduating due to the unexpected costs.

12.     This action seeks to recover tens of millions of dollars in tuition that Plaintiffs and other Class members had to pay due to GCE's fraud scheme and other relief authorized by law.

---

[2]   https://www.ed.gov/news/press-releases/us-department-education-office-federal-student-aid-fines-grand-canyon-university-377-million-deceiving-thousands-students (last visited June 3, 2024).

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to: (a) 18  U.S.C. § 1965(a), which authorizes the initiation of a "civil action" under RICO in a "district court of the United States"; and (ii) 28 U.S.C. § 1331, which confers federal question jurisdiction on actions arising under a federal statute like RICO.

14.    This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

15.    This Court has personal jurisdiction over GCE pursuant to 18 U.S.C. § 1965(a) because GCE can be found in this District and transacts business in this District.

16.    Venue is proper in this District under (i) 18 U.S.C. § 1965(a) because GCE can be found in and transacts business in this District; and (ii) 28 U.S.C. § 1391 because the acts and omissions that give rise to the allegations and claims asserted in this action substantially occurred in this District.

## III.    PARTIES AND OTHER RELEVANT ENTITIES AND INDIVIDUALS

17.    Plaintiff **Tanner Smith** is a resident of Fairmount, West Virginia. Plaintiff Smith enrolled in September 2018 in the doctoral program in General Psychology at Grand Canyon University with an emphasis in industrial and organizational psychology. After having to pay $8,400 for four "continuation courses," Plaintiff Smith earned his doctorate in July 2022.

18.    Plaintiff **Qimin Wang** is a resident of La Quinta, California. Plaintiff Wang enrolled in March 2019 in the doctoral program in Education at Grand Canyon University. Since May 2023, Plaintiff Wang has had to take and pay for four "continuation courses" to work on her doctoral dissertation, which has cost her almost $8,700. Further, GCE may require Plaintiff Wang to pay for yet more continuation courses to obtain a doctoral degree.

19.    Defendant **GCE** is a for-profit corporation registered in Delaware with its principal executive offices in Phoenix, Arizona. Throughout the Class Period (*i.e.*, January 1, 2017, to the present), GCE has either owned or controlled both iterations of Grand Canyon University—Old GCU and the GCU Enterprise (both of which are described below). GCE also has been

CLASS ACTION COMPLAINT

exclusively responsible for marketing and recruiting efforts for Grand Canyon University, including such efforts directed at prospective doctoral students. *See infra* ¶¶ 74–87.

20.    **Grand Canyon University** was originally founded in 1949 as a non-profit educational institution with an emphasis on religious studies.[3] In February 2004, it was acquired by, and became a for-profit subsidiary of, GCE (then known as Significant Education, LLC).

21.    During the Class Period, Grand Canyon University existed in two iterations. In its first iteration ("**Old GCU**"), it was owned and operated by GCE as a for-profit subsidiary until July 2018. During that time, Old GCU was a major recipient of federal student aid from ED.

22.    The current iteration of Grand Canyon University (the "**GCU Enterprise**") is a nominally non-profit educational institution registered in Arizona that enrolls more than 100,000 students in undergraduate, graduate, and certificate programs. The GCU Enterprise is supposedly independent from GCE. In fact, GCE has controlled the GCU Enterprise's operations and policies since its creation in July 2018. Specifically, in 2017 and 2018, senior GCE executives orchestrated a series of corporate transactions to establish the GCU Enterprise as a non-profit entity nominally independent from GCE. *See infra* ¶¶ 63–73. The GCU Enterprise has been a major recipient of federal student aid from ED since its creation.

23.    Within the Old GCU and the GCU Enterprise, doctoral programs were operated by the **College of Doctoral Studies**. Throughout the Class Period, **Michael Berger**, who was an executive at GCE until at least July 2018, has been the Dean of the College of Doctoral Studies.

24.    Finally, GCE exercised its control over the GCU Enterprise through its senior executives including **Brian Mueller**. Mr. Mueller, for example, has simultaneously served as the CEO, Board Chair, and President of GCE, while also serving as the President of the GCU Enterprise.

25.    As noted above, Old GCU and the GCU Enterprise were both major recipients of federal student aid from ED. During ED's 2022-2023 award year, for example, the GCU

---

[3] Grand Canyon University was originally called Grand Canyon College. In 1989, and on the 40th anniversary of its founding, it was renamed to Grand Canyon University.

Enterprise received approximately $1 billion in total federal student aid (*e.g.*, federal student loans), including more than $18 million for first-year doctoral students.

26.    As a condition of receiving federal student aid, Old GCU and the GCU Enterprise were required to enter into program participation agreements with ED, which set forth program requirements, including program integrity requirements. *See* 20 U.S.C. § 1094.

27.    By entering into program participation agreements with ED, Old GCU and the GCU Enterprise agreed, *inter alia*, to comply with 20 U.S.C. § 1092, including to provide information to students that "shall accurately describe . . . the cost of attending [GCU], including (i) tuition and fees" as required by § 1092(a)(1)(E).

28.    20 U.S.C. § 1094(c) of the HEA authorizes ED to issue regulations to enforce program integrity requirements, including the requirement that an educational institution must not "engage[] in substantial misrepresentation of . . . its financial charges." Congress provided this authority "to protect students from 'false advertising' and other forms of manipulative 'sharp practice.'" *Ass'n of Private Sector Colls. v. Duncan*, 681 F.3d 427, 436 (D.C. Cir. 2012) (quoting H.R. Rep. No. 94-1086, at 13 (1976)).

29.    Pursuant to that authority, ED promulgated regulations to define "misrepresentation concerning the nature of an eligible institution's financial charges" to "include[] false, erroneous, or misleading statements concerning . . . the cost of the program." 34 C.F.R. § 668.73.

30.    ED regulations also provide that, because the GCU Enterprise "has an agreement" with GCE, *i.e.*, the Master Services Agreement ("MSA"), "to provide marketing, advertising, [and] recruiting [] services," any marketing, advertising, and recruiting materials that GCE disseminates on behalf of the GCU Enterprise must likewise give students accurate information concerning the cost of doctoral programs and not misrepresent those costs. 34 C.F.R. § 668.71.

31.    Senior GCE executives, including CEO Brian Mueller, were aware of GCE's obligation to comply with these federal laws and regulations. During the Class Period, Mr. Mueller simultaneously served as the GCU Enterprise's President. In that role, he has signed the

program participation agreements on behalf of the GCU Enterprise. Accordingly, he was directly responsible for its compliance with the program participation agreements, including compliance with the requirement under 34 C.F.R. § 668.73 to refrain from giving students any "false, erroneous, or misleading" information "concerning the cost of [GCU's doctoral] program[s]."

32. Mr. Mueller's experience prior to his position at GCE also gave him ample reasons to be aware of GCE's obligation to conduct marketing, advertising, and recruiting activities in accordance with federal law, ED regulations, and the program participation agreement.

33. Specifically, before joining GCE in 2008, Mr. Mueller was a senior executive at another for-profit education company, University of Phoenix. During that time, University of Phoenix failed to comply with federal laws and regulations that prohibit paying incentive compensation to admissions counselors based on the number of students recruited.

34. As a result of those violations, University of Phoenix was named as the defendant in a civil fraud lawsuit. *See U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006). In December 2009, after the Ninth Circuit overturned dismissal of those fraud claims, *see id.*, University of Phoenix paid $67.5 million to the federal government in settlement of the alleged civil fraud violations.[4]

### IV.   FACTUAL ALLEGATIONS

**A.   GCE's Scheme to Defraud Doctoral-Degree Students Like Plaintiffs**

35. Throughout the Class Period, GCE was exclusively responsible for marketing and recruiting for the doctoral programs at Grand Canyon University.[5] GCE aggressively marketed and recruited prospective doctoral students to increase its revenue and profit.

36. For example, to recruit prospective students, GCE carried out nationwide marketing campaigns that involved both online and social media advertisements and the use of sales representatives to conduct telemarketing to students.

---

[4]   *See*  https://www.justice.gov/opa/pr/university-phoenix-settles-false-claims-act-lawsuit-675-million (last visited Feb. 24, 2024).

[5]   In 2017 and early 2018, GCE conducted marketing and recruiting for its subsidiary, Old GCU. After July 2018, GCE carried out these functions for the GCU Enterprise, which GCE controlled.

37.    Instead of being forthright about the sales representatives' role as telemarketers for GCE, GCE directed them to tell prospective students that they were counselors at Grand Canyon University. Further, rather than making the prospective students' goals the top priority of those "counselors", GCE assigned specific quotas of students—called "Annual Student Counts"—that each counselor was expected to enroll and retain.

38.    At the same time, GCE significantly expanded the doctoral programs at Grand Canyon University. In 2018, there were only 16 doctoral programs. By 2022, the number had more than doubled to 35.

39.    To sustain this expansion, GCE orchestrated a scheme to defraud prospective doctoral students by supplying them with marketing materials and enrollment forms with false "estimated tuition" and "total estimated cost" data.

40.    Those estimates informed prospective students that they could obtain doctoral degrees by paying 60 credits worth of tuition costs. But GCE knew this was untrue for almost all doctoral students at Grand Canyon University. Instead, most students paid thousands of dollars more in tuition for "continuation courses" after completing 60 credits' worth of courses.

41.    GCE marketed the doctoral programs at Grand Canyon University as offering an "accelerated path" to doctorates:

> Are you looking to advance your education by earning a doctoral degree? At Grand Canyon University, the doctoral journey is truly unique. From day one, you are placed on an accelerated path that will prepare you to succeed in your academic journey and career. Here are four ways to make the most of your doctoral journey at GCU:

42.    GCE also told prospective students that they would obtain doctoral degrees on an "accelerated" basis because they could "get a head-start" on their doctoral dissertations "at GCU":

## Get a Head-Start on Your Dissertation

Unlike many other doctoral programs, at GCU, you will begin the dissertation process at the start of your program. In your first course, you will be introduced to the doctoral dispositions with emphasis on understanding expectations for scholarly work.

43.     Further, GCE made the affordability of the "tuition rate" of doctoral programs at Grand Canyon University a key marketing point:



Competitive, **affordable** tuition rate so that furthering education is within reach for all[1]

44.     GCE gave prospective students detailed tuition cost information for different doctoral programs on Grand Canyon University's website and marketing materials. For example, in 2023, the webpage for the doctoral program in Psychology (Cognition and Instruction—Qualitative) offered key tuition cost information for prospective students in terms of the number of credits required and the cost per credit:



45.     According to this webpage, which was created and maintained by GCE, the "Total Credits" needed to complete the degree was 60, and the "Tuition Rate" was $725 per credit. In other words, the total tuition cost of completing this doctoral degree was $43,500.

46.    Prospective students who followed the "More Info" links on this webpage would find further confirmation that the tuition cost for this degree was $43,500. Specifically, the "More Info" page for "Total Credits" elaborated on the 60 credits requirement by listing 20 courses associated with that requirement, including three dissertation courses included within the 60 credits. And the "More Info" link for "Tuition Rate" took prospective students to a general tuition and costs page.[6]

47.    When prospective students express a serious interest in a doctoral program at Grand Canyon University, GCE sends them an Application for Admission, which contains a standard, three-page enrollment agreement for the relevant program. As illustrated by the Doctor of Business Administration example below, the enrollment agreement not only contains information on the number of total credits needed to complete the degree, the cost per credit hour, and a list of required courses, but also provides the exact "Total Program Cost" or "Total Program Tuition and Fees":

---

[6]    If prospective students followed the link for dissertation courses, they would again be informed that these programs require 60 credits at a cost of $725 per credit.

**Doctor of Business Administration with an Emphasis in Data Analytics**
Enrollment Agreement

48.     The truth of the matter is that the "Total Program Cost" stated in the enrollment agreement that GCE distributes to prospective students significantly understates the actual total costs that they would need to pay to complete their degrees.

49.     What GCE has not disclosed to prospective students—but senior GCE executives have known since at least January 2017—is that almost none of the doctoral students at Grand Canyon University obtains their degrees after paying the tuition costs for 60 credits, including credits for the three dissertation courses.

50.     Instead, doctoral students at Grand Canyon University routinely encounter lengthy delays in their efforts to complete their dissertations due to policies and practices enacted by GCE

that create artificial bottlenecks in the dissertation process. These include Byzantine review procedures that prevent doctoral students from communicating directly with key dissertation reviewers. They also include up to nine "Milestones" that require students to wait for extended periods of time as they try to make progress on their dissertations.

51. While doctoral students face these delays due to the artificial bottlenecks created by GCE, they also are required by GCE to enroll in "continuation courses" in order to maintain their enrollment and be eligible to obtain their doctoral degrees. In other words, students are compelled to pay for those "continuation courses" *after* they have completed 60 course credits and paid the tuition for those credits.

52. According to ED's analysis of outcome data, less than 2% of the more than 1,800 students who completed doctoral programs at Grand Canyon University between 2021 and 2017 did so while paying the total program cost that GCE provided to them:[7]

**Table 2. Continuation Courses Taken by 1,858 Graduates between 2011 and 2017[17]**

| Number of Continuation Courses (Enrollments from 1/2011 – 7/2022) | Percentage of Graduates | Additional Time | Additional Tuition/Institutional Cost |
|---|---|---|---|
| 0 | 1.7% | NA | NA |
| 1 | 2.1% | 12 Weeks | $2,106 |
| 2 | 5.5% | 24 Weeks | $4,212 |
| 3 | 6.3% | 36 Weeks | $6,318 |
| 4 | 6.7% | 48 Weeks | $8,424 |
| 5 | 42.9% | 60 Weeks | $10,530 |
| 6+ | 34.8% | 72+ Weeks | $12,636+ |

53. Senior GCE executives, moreover, have known that the representations GCE was making to prospective students about the total program cost and tuition cost of doctoral programs at Grand Canyon University were false.

---

[7] According to ED, this analysis was based on data produced by Grand Canyon University concerning its doctoral student outcomes from 2011 to 2022. *See* Ex. 2 at 6. ED also performed an analysis of outcome data for students who enrolled between July 2017 and June 2022. In this cohort, more than 90% of students who graduated by January 2023 had to take at least one continuation course, and more than 63% of the students in this cohort had withdrawn by January 2023. *See id.*

54.    For example, in a series of emails from January 10, 2017, Michael Berger, the senior GCE executive who led the College of Doctoral Studies, discussed with one of his top subordinates that GCE's own internal analysis showed that most doctoral students were required to pay for multiple "continuation courses to complete their degrees."

**From: Nikki Mancuso**
**Sent:** Tuesday, January 17, 2017 2:20 PM
**To:** Michael Berger
**Subject:** RE: Graduates and continuation courses needed for this past year
Yes:
It is getting Dan 5 the grads and continuation data so he can determine what we should update this verbiage to show:
* On average, doctoral students who graduated during the 2014/15 academic year required 5.25 continuation courses to complete their degree.
Continuation Courses*... $1925 per course (1st 5 courses); $500 per course (6th course and beyond)
**Nikki Mancuso, MAOM**
Senior Vice President, College of Doctoral Studies

Grand Canyon University
3300 W. Camelback Road Phoenix, AZ 85017
1-800-800-9776

**From: Michael Berger**
**Sent:** Tuesday, January 17, 2017 2:19 PM
**To:** Nikki Mancuso <
**Subject:** RE: Graduates and continuation courses needed for this past year
Can you remind me what this is?
Michael Berger, EdD
Dean
College of Doctoral Studies
Grand Canyon University

**From: Nikki Mancuso**
**Sent:** Tuesday, January 17, 2017 1:40 PM
**To:** Michael Berger <
**Subject:** Graduates and continuation courses needed for this past year
Hi Michael,
When do you plan to get this data?

**Nikki Mancuso, MAOM**
Senior Vice President, College of Doctoral Studies

55.    In August 2017, senior GCE executives, including Mr. Berger, again engaged in a discussion of "up to date data on our graduates." According to this internal GCE analysis, 70% of the doctoral program graduates were unable to complete their degrees without having to pay for three or more continuation courses.

56.     GCE never updated the program cost information on the website it operated or in the application and enrollment packets it sent to prospective students to reflect true the costs. As late as 2021, the enrollment agreement for the Ph.D. program in General Psychology (Industrial and Organizational Psychology with focus in Quantitative Research) still showed students a total program tuition and fees (for 60 credits) that did not include the cost of any continuation course:

| Program Major: | | 60 credits |
|---|---|---|
| Total Degree Requirements: | | 60 credits |
| **Required Program Major Courses** | | **Credits** |
| RES-815 | Introduction to Research | 3 |
| RES-820C | The Literature Landscape: Psychology | 3 |
| PSY-810 | History and Systems of Psychology | 3 |
| PSY-802 | Psychoanalysis and Psychodynamic Theory | 3 |
| RES-831 | Foundations of Research Design 1 | 3 |
| RSD-851 | Residency: Dissertation | 3 |
| RES-832 | Foundations of Research Design 2 | 3 |
| PSY-803 | Behaviorism | 3 |
| PSY-830 | Principles of Industrial and Organizational Psychology | 3 |
| PSY-804 | Humanistic, Transpersonal and Existential Psychology | 3 |
| RES-842 | Designing a Quantitative Study 1 | 3 |
| RES-844 | Designing a Quantitative Study 2 | 3 |
| PSY-834 | Psychology of Consulting and Coaching | 3 |
| RSD-884 | Residency: The Quantitative Dissertation | 3 |
| PSY-836 | Principles of Personnel and Human Resource Management | 3 |
| PSY-955 | Dissertation I | 3 |
| RES-874 | Quantitative Data Collection and Statistical Mechanics | 3 |
| PSY-960 | Dissertation II | 3 |
| RES-884 | Quantitative Data Analysis, Results, and Findings | 3 |
| PSY-965 | Dissertation III | 3 |
| **Required Program Major Course Total Credits** | | **60** |

A minimum of 60 credits are required for completion of this program of study.
If taking one course at a time, this program will take a minimum of 39 months.  Students with transfer credit that applies to this program will shorten the time to completion from that stated on this enrollment agreement.

Total Program Credits: 60
Cost Per Credit: $715
Learning Service Management Fee Per Program: $550
Graduation Fee Per Program: $150
Course Fees: $2,630
Total Program Tuition and Fees: $46,230

Estimated Additional Costs
Book Costs: $650

57.     While the enrollment packet provides several notes on potential changes and additions to the program cost—such as potential changes to "retail pricing provided by publishers" of print textbooks, potential changes to "current tuition rates and fees," and a "one-time learning management service fee"—it does not disclose that requiring students to take continuation courses could, and usually do, substantially increase the program cost.

58.    By fraudulently misrepresenting the true cost of completing doctoral programs at Grand Canyon University as part of its aggressive marketing campaign, GCE has been able to leverage its control over Old GCU and the GCE Enterprise and profit from the fraud.

59.    The continuation courses are especially profitable for GCE. Even though doctoral students enrolled in continuation courses are only working on their dissertation and do not receive instruction from faculty, Grand Canyon University charges the same price for the first five continuation courses as regular content courses. Thus, the continuation courses have allowed GCE to reap significant tuition revenue from doctoral students while incurring lower instructional and operating cost.

60.    GCE also profits from the continuation courses because its policies and practices create artificial roadblocks in the dissertation process. GCE's dissertation review procedures prohibit doctoral students from communicating directly with key reviewers, thus delaying the students' ability to make progress on their dissertations. Policies enacted by GCE also require doctoral students to fulfill up to nine separate "milestones" in their dissertation process. To fulfill each milestone, a doctoral student must correspond with an advisor or a review committee to obtain and address their comments. Instead of corresponding promptly with students, the advisors and review committees routinely wait up to two weeks to provide minor comments or approve minor changes. The cumulative result of these and other artificial roadblocks created by GCE's policies and practices is that nearly all of the doctoral students at Grand Canyon University are compelled to enroll in—and pay for—expensive continuation courses, which has redounded to GCE's financial benefit.

61.    The false information GCE provided to doctoral students at Grand Canyon University regarding the cost of their programs has exacted significant financial tolls. According to ED's analysis, over 90% of the doctoral students who first enrolled in July 2017 and graduated before June 2022 had to take, and pay for, continuation courses.

62.    The undisclosed cost of the doctoral programs also has contributed to the high rate of withdrawal among doctoral students at Grand Canyon University. According to ED's analysis,

more than 63% of the doctoral students who first enrolled in July 2017 withdrew from their programs by June 2022. Those students paid thousands of dollars in tuition – in most cases by taking out education loans – without ever obtaining degrees.

**B.    GCE's Creation of the GCU Enterprise in July 2018 and GCE's Control of the GCU Enterprise Since July 2018.**

63.    In February 2004, GCE acquired the assets of Old GCU, which was operating as a non-profit university.[8] From 2004 until 2018, GCE operated Old GCU as a for-profit educational institution. During this period, GCE's business activities consisted solely of operating Old GCU.[9]

64.    Starting in 2014, well before the start of the Class Period, GCE began making plans to turn Old GCU into a non-profit entity that would be nominally independent from GCE.

65.    To replace Old GCU with GCU Enterprise, senior GCE executives orchestrated a series of transactions in 2017 and 2018 that were known within GCE as "Project Gazelle," because they involved using a purportedly independent entity called Gazelle University, which Brian Mueller, the CEO of GCE, had chartered in 2014.

66.    For GCE, a key purpose of Project Gazelle was to improve GCE's effectiveness at recruiting prospective doctoral students like Plaintiff. In April 2018, for example, GCE's board of directors received a report regarding Project Gazelle prepared by Barclays, which explained this project was "attractive" because establishing the GCU Enterprise as a non-profit entity would allow GCE to "grow its student population" and "mitigate the potential risk (perceived or real) posed by its for-profit status."

---

[8]    GCE was initially formed in November 2003 as Significant Education, LLC. In August 2005, Significant Education, LLC converted from a limited liability company to a corporation and changed its name to Significant Education, Inc. In May 2008, Significant Education, Inc. changed its name to GCE. Later in 2008, GCE became a publicly traded company.

[9]    Starting in 2018, GCE expanded its business to provide education services to other institutions. For example, in December 2018, GCE acquired Orbis Education and, through that acquisition, took over Orbis's business of providing services to a group of 17 universities. According to GCE's most recent annual report, GCE "provided education services and support to approximately 113,000 students," with "more than 108,600" of them "enrolled in GCU's programs, emphases, and certificates," as of December 31, 2022

67.    In December 2018, Brian Mueller, GCE's CEO, boasted that creating a nominally independent non-profit entity gave GCE "a tailwind" with recruiting students "just because of how many students didn't pick up the phone because we were for-profit."

68.    Mr. Mueller also told investors in February 2019, that "being out there a million times a day saying we're non-profit has had an impact" on recruiting new students online.

a)    Project Gazelle and Creation of the GCU Enterprise in July 2018.

69.    As implemented, Project Gazelle had two major components. ***First***, in July 2018, GCE "sold" the assets of Old GCU to Gazelle University for more than $850 million. Post-sale, Gazelle University changed its name to Grand Canyon University.

70.    This sale was not an arms-length transaction, but rather one orchestrated by GCE. Gazelle University was not actually independent from GCE. Instead, as noted above, it had been chartered by GCE's CEO, Brian Mueller.

71.    Gazelle University did not have to come up with the funding to buy Old GCU. Instead, GCE—the purported seller—was the source of all the funding for this sale. GCE "loaned" Gazelle University the entire amount (more than $850 million) that Gazelle paid to purchase the assets and operations of Old GCU. Those funds then promptly flowed back to GCE when Gazelle made the acquisition and changed its name to Grand Canyon University.

72.    Despite immediately recouping its loan in this round-trip transaction, GCE obtained a direct interest in the GCU Enterprise. Specifically, GCE received a Senior Secured Note in July 2018 in return for loaning Gazelle the entire purchase price for Old GCU.

73.    Pursuant to this Senior Secured Note, GCE has been receiving approximately $50 million a year in interest payments from the GCU Enterprise. GCE also is entitled to a lump-sum repayment of the principal amount ($853 million) from the GCU Enterprise in July 2025. Finally, this Senior Secured Note gives GCE a security interest in the properties of the GCU Enterprise.

74.    GCE also obtained the ability to control and dominate GCU's operations and policies by making the GCU Enterprise enter into a Master Services Agreement with GCE, which had a 10-yearlong initial term and renewal by default every five years thereafter.

75.     Under this Master Services Agreement, the GCU Enterprise is required to pay GCE a fee equal to 60% of its adjusted gross revenue—including revenue from tuition and fees from students like Plaintiff—in return for providing certain services.

76.     Under the Master Services Agreement, GCE also is entitled to the same percentage of services fees irrespective of how the GCU Enterprise's revenue changes in relation to GCE's costs to provide these services. Further, the agreement places on limit on the total amount of services fee that the GCU Enterprise must pay GCE. In other words, if the GCU Enterprise's tuition and fees revenues doubles while GCE's costs stay flat, the agreement requires GCU Enterprise to pay twice as much in services fees to GCE.

77.     Overall, having the GCU Enterprise pay service fees to GCE has resulted in a dramatic increase in costs to Grand Canyon University while providing a significant financial benefit for GCE. A report that GCE's board of directors received from Barclays in April 2018 indicated that "the costs to operate [Grand Canyon University] following the change of ownership (with GCE providing services) would increase from $810 million to $1.496 billion in fiscal year 2019, solely as a result of fees paid to GCE."

78.     In addition, the Master Services Agreement made GCE the "exclusive" provider of essential services like technology, budgeting analysis, enrollment, marketing, and student support.

79.     GCE made it infeasible for the GCU Enterprise to seek out other vendors to supply services for which GCE is not designated as the "exclusive" provider. Under the Master Services Agreement, the GCU Enterprise is required to pay the same 60% of its adjusted gross revenue to GCE even if it were to pick another vendor to supply services such as procurement or auditing.

80.     GCE also made it practically impossible for the GCU Enterprise to emerge from GCE's control. Under the Master Services Agreement, the GCU Enterprise is required to pay GCE 60% of its adjusted gross revenue each year until 2028. If it opts out of the agreement, the GCU Enterprise is required to pay GCE in one lump-sum a "non-renewal fee" equal to the 50% of the fees that GCE had received over the preceding year—which would amount to hundreds of

millions of dollars.

81.    As ED noted in its 2019 decision denying the GCU Enterprise's request to be recognized as a non-profit educational institution, the combination of the Master Service Agreement and the Senior Secured Note meant that GCE received as much as 95% of the annual revenues of the nominally independent GCU Enterprise. Indeed, as GCE's board of directors were informed by corporate advisors in 2017 and 2018, a key purpose of Project Gazelle—the creation of the purportedly non-profit and nominally independent GCU Enterprise—was to benefit the financial interests of *GCE's* shareholders.

b)    GCE's Control of the GCU Enterprise Since July 2018.

82.    Since July 2018, the GCU Enterprise has functioned as an instrument through which GCE profits from fraud schemes directed at students like Plaintiff, who enrolled in doctoral-degree programs at the GCU Enterprise.

83.    GCE has done so by controlling and dominating the operations and policies of the GCU Enterprise, including those relating to the doctoral-degree programs at issue here.

84.    For example, GCE has ensured its control of the GCU Enterprise by having the key functions managed by GCE executives and employees.

85.    As noted above, Brian Mueller has served as both the CEO of GCE and as the President of the GCU Enterprise since July 2018.

86.    Of the 58 GCE senior executives responsible for managing and overseeing Old GCU's operations before July 2018, 41 (including Mr. Mueller) continued to work at GCE, rather than at the GCU Enterprise, after July 2018.

87.    Additionally, when the GCU Enterprise came into existence, the 17 top positions below President were filled by former GCE executives. The Dean of the College of Doctoral Studies—where Plaintiffs and other Class members were enrolled—is Michael Berger, who served in the same role as a GCE executive prior to July 2018.[10]

---

[10]    GCE's control over the GCU Enterprise is also underscored by how GCE responded to ED's 2019 decision refusing to recognize the GCU Enterprise as a nonprofit institution for purposes of Title IV of

**C.      Plaintiff Smith's Financial Loss Due to GCE's Fraud Scheme.**

88.      Plaintiff Tanner Smith stands in the shoes of thousands of victims of GCE's fraud scheme. He would not have enrolled in a doctoral-degree program at Grand Canyon University if GCE and a counselor acting at GCE's direction had disclosed to him in 2018 that the estimated tuition cost that GCE represented to him significantly understated the true cost to complete the program.

89.      In May 2018, Plaintiff Smith requested information from Grand Canyon University regarding its doctoral program in General Psychology with an emphasis in Industrial and Organizational Psychology.

90.      In response, Plaintiff Smith was contacted by LH[11] from Grand Canyon University, who proceeded to communicate with Plaintiff Smith over telephone and electronic mail to persuade him to enroll in this doctoral program.

91.      On May 18, 2018, LH sent an e-mail to Plaintiff Smith with the subject line: "Grand Canyon University-Your Proposed Graduation Timeline." This email attached a "Proposed Graduation Timeline," described as a "personalized proposed schedule based on the degree program [Plaintiff Smith] selected." According to this email, the Proposed Graduation Timeline "outlines *each course* you will need to complete." (emphasis added).

92.      According to this Proposed Graduation Timeline, if Plaintiff Smith were to begin his doctoral program in July 2018, his "Expected Graduation Date" would be May 26, 2021. In other words, Plaintiff Smith was told that he could expect to graduate with his doctoral degree within three years of beginning his doctoral studies at Grand Canyon University.

93.      This Proposed Graduation Timeline also stated that Plaintiff Smith could expect to

---

the Higher Education Act. To assuage ED, GCE had the GCU Enterprise offer to amend the Master Services Agreement to make the terms more favorable to the GCU Enterprise. GCE, however, made the GCU Enterprise condition the "adoption of the [amended Master Services Agreement] contingent on," inter alia, ED's "approval of GCU's nonprofit status." *See Grand Canyon Univ. v. Cardona*, 2022 WL 18456049 (D. Ariz. Dec. 1, 2022).

[11]   In the interest of privacy, Plaintiffs refers to the sales representatives that GCE assigned to them—MA, LH, KV, and TL—by their initials.

graduate with his doctoral degree after completing 60 credit hours. It did not disclose that he would need to take and pay for continuation courses to complete the doctoral program.

94.     According to ED's investigation, GCE provided similar graduation timelines to other prospective students and used those timelines to lure students to enroll in doctoral degree programs at Grand Canyon University.

95.     Plaintiff Smith also received a "Proposed Cost" document from LH. This document gave him a "personalized college cost estimation" for the Ph.D. program in General Psychology with an emphasis in Industrial and Organizational Psychology at Grand Canyon University.

96.     The "Proposed Cost" document informed Plaintiff Smith that he could expect to pay $39,000.00 in "Estimated Tuition" to complete his doctoral degree:

### Academic Year (AY) 2017 - 2018

| Estimated Costs | AY1 | AY2 | AY3 | AY4 | AY5 | Total |
|---|---|---|---|---|---|---|
| Credit Hours | 12 | 15 | 15 | 12 | 6 | 60 |
| Estimated Tuition | $7,800 | $9,750 | $9,750 | $7,800 | $3,900 | $39,000 |
| Canyon Connect Fee | $420 | $420 | $420 | $420 | $210 | $1,890 |
| Learning Management System Fee | $400 | $0 | $0 | $0 | $0 | $400 |
| Course/Lab/Graduation Fees | $0 | $795 | $795 | $0 | $150 | $1,740 |
| Total Estimated Cost | $8,620 | $10,965 | $10,965 | $8,220 | $4,260 | $43,030 |
| | | | | | | |
| **Scholarships and Other Aid** | | | | | | |
| Total Estimated Scholarships and Other Aid | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | |
| **Financial Aid** | | | | | | |
| Total Estimated Federal Aid | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | |
| **Summary** | | | | | | |
| Estimated Net Cost | $8,620 | $10,965 | $10,965 | $8,220 | $4,260 | $43,030 |
| Total Estimated Federal Aid | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Estimated Out of Pocket Cost (Credit) | $8,620 | $10,965 | $10,965 | $8,220 | $4,260 | $43,030 |

97.     While this proposed cost identified three specific fees (the Canyon Connect Fee, the Learning Management System Fee, and the Course/Lab/Graduation Fees) that were included (along with the "Estimated Tuition") in the "Total Estimated Cost," it did not include the cost of any continuation courses—let alone the four different continuation courses that GCE eventually

required Plaintiff Smith to pay for.[12]

98.    According to ED's investigation, GCE provided similar proposed cost documents to other prospective students and used those documents to lure students to enroll in doctoral degree programs at Grand Canyon University by falsely representing how much it would cost students to complete their doctoral degrees.

99.    After receiving the graduation timeline and the false and misleading estimated tuition cost and total estimated cost information from LH and GCE, Plaintiff Smith decided to enroll in the Ph.D. program in General Psychology at Grand Canyon University in July 2018.

100.    In the course of Plaintiff Smith's numerous communications with LH over telephone and e-mail, neither LH nor any other representative of GCE (or Old GCU or GCU Enterprise) disclosed to him the truth about the actual cost to complete his Ph.D. program. Even though senior GCE executives like Michael Berger knew that almost none of the doctoral students at Grand Canyon University completed their degrees with just 60 credits and that at least 70% of those students had to pay thousands, often tens of thousands, of dollars more in tuition for at least three "continuation courses" to complete their degrees, this information was never given to Plaintiff Smith.

101.    In or about July 2018, Plaintiff Smith began taking courses in Grand Canyon University's Ph.D. program in General Psychology. At that time, and throughout his studies at Grand Canyon University, Plaintiff Smith lived in West Virginia and took classes remotely via online platforms.

102.    Plaintiff Smith was able to complete his 60 credit hours of doctoral course studies in approximately three years, *i.e.*, by Fall, 2021, consistent with the proposed timeline from LH.

103.    As Plaintiff Smith neared completion of his 60 credit hours of required coursework, GCE determined that Plaintiff Smith could not complete his Ph.D. degree program

---

[12]    While information materials provided by GCE to Plaintiff Smith mentioned continuation courses, those materials never included the cost of continuation courses in either the estimated tuition or the total estimated cost for Plaintiff Smith to complete his doctoral degree.

with those 60 credit hours and, instead, would be required to take continuation courses to complete his dissertation and earn his doctoral degree.

104.    The innumerable delays that Plaintiff Smith encountered during the dissertation process at Grand Canyon University resulted in him having to incur costs for continuation courses that he was not told about before enrolling.

105.    While completing his dissertation, Plaintiff Smith's academic advisors repeatedly required him to submit and resubmit drafts for review in response to minor and insignificant edits that could have been addressed more efficiently. Almost every time, moreover, Plaintiff Smith found that the academic advisors failed to respond promptly to his submissions. Instead, they habitually waited two weeks (*i.e.*, 10 business days) to respond to simple questions or minor edits, thus delaying Plaintiff Smith's ability to make progress on and complete his dissertation.

106.    These routine delays were amplified by GCE's policies requiring doctoral students to fulfill nine milestones to complete their dissertation. In connection with each milestone, Plaintiff Smith encountered artificial bottlenecks. The cumulative effect of these roadblocks significantly delayed Plaintiff Smith's ability to complete his dissertation and caused him to pay for continuation courses.

107.    In September 2021, GCE required Plaintiff Smith to enroll in his first continuation course, "Research Continuation I." Per policy established by GCE, completion of this continuation course was required for Plaintiff Smith to complete work on his dissertation, in order to earn his doctoral degree.

108.    In December 2021, GCE required Plaintiff Smith to enroll in a second continuation course, "Research Continuation II." Per policy established by GCE, completion of this continuation course was required for Plaintiff Smith to complete work on his dissertation, in order to earn his doctoral degree.

109.    In March 2022, GCE required Plaintiff Smith to enroll in his third continuation course, "Research Continuation III." Per policy established by GCE, completion of this continuation course was required for Plaintiff Smith to complete work on his dissertation, in order

to earn his doctoral degree.

110.    In June 2022, GCE required Plaintiff Smith to enroll in his fourth continuation course, "Research Continuation IV." Per policy established by GCE, completion of this continuation course was required for Plaintiff Smith to complete work on his dissertation, in order to earn his doctoral degree.

111.    As a result, Plaintiff Smith did not receive his Ph.D. degree in General Psychology from Grand Canyon University until September 2022 (at least 12 months after his promised completion date) and after having paid for a total of 72 credit hours.

112.    Due to GCE's repeated misrepresentations and omissions regarding the cost required to complete his Ph.D., Plaintiff Smith paid $8,463.00 for continuation courses above the program cost that he had been told about.

**D.    Plaintiff Wang's Financial Loss Due to GCE's Fraud Scheme.**

113.    Plaintiff Qimin Wang also stands in the shoes of thousands of victims of GCE's fraud scheme. She would not have enrolled in the Doctor of Education program at Grand Canyon University in March 2019 if GCE and a "counselor" acting at GCE's direction had disclosed to her that the estimated tuition cost that GCE provided to her in fact significantly understated the true cost to complete her degree program.

114.    In early 2019, Plaintiff Wang requested information from Grand Canyon University regarding its Doctor of Education program.

115.    In response, Plaintiff Wang was contacted by TS from Grand Canyon University, who proceeded to communicate with Plaintiff Wang over electronic mail and telephone to persuade her to enroll in this doctoral program.

116.    Iin e-mails and phone calls, TS provided Plaintiff Wang a detailed breakdown of the timeline of her coursework. TS advised Plaintiff Wang that she would be able to obtain her doctorate by completing 60 credits and should finish in approximately three years.

117.    According to ED's investigation, GCE provided similar graduation timelines to other prospective students and used those timelines to lure students to enroll in doctoral degree

programs at Grand Canyon University by falsely representing how long it would take students to complete their doctoral degrees.

118.    Plaintiff Wang also received a "GCU Price Sheets" document from TS. This document gave her a "personalized college cost estimation" for the Doctor of Education program in Organizational Leadership at Grand Canyon University.

119.    According to this "GCU Price Sheets," Plaintiff Wang could expect to pay $39,000.00 in "Estimated Tuition" to complete her doctoral degree:

## Academic Year (AY) 2018 - 2019

| Estimated Costs | AY1 | AY2 | AY3 | AY4 | AY5 | Total |
|---|---|---|---|---|---|---|
| Credit Hours | 12 | 15 | 15 | 12 | 6 | 60 |
| Estimated Tuition | $7,800 | $9,750 | $9,750 | $7,800 | $3,900 | $39,000 |
| Canyon Connect Fee | $460 | $460 | $460 | $460 | $230 | $2,070 |
| Learning Management System Fee | $400 | $0 | $0 | $0 | $0 | $400 |
| Course/Lab/Graduation Fees | $0 | $795 | $795 | $0 | $150 | $1,740 |
| Total Estimated Cost | $8,660 | $11,005 | $11,005 | $8,260 | $4,280 | $43,210 |
| | | | | | | |
| Scholarships and Other Aid | | | | | | |
| MOU-Coachella USD | $780 | $975 | $975 | $780 | $390 | $3,900 |
| Total Estimated Scholarships and Other Aid | $780 | $975 | $975 | $780 | $390 | $3,900 |
| | | | | | | |
| Financial Aid | | | | | | |
| Total Estimated Federal Aid | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | |
| Summary | | | | | | |
| Estimated Net Cost | $7,880 | $10,030 | $10,030 | $7,480 | $3,890 | $39,310 |
| Total Estimated Federal Aid | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Estimated Out of Pocket Cost (Credit) | $7,880 | $10,030 | $10,030 | $7,480 | $3,890 | $39,310 |

120.    While this proposed cost identified three specific fees (the Canyon Connect Fee, the Learning Management System Fee, and the Course/Lab/Graduation Fees) that were included (along with the "Estimated Tuition") in the "Total Estimated Cost," it did not include the cost of any continuation courses — let alone the four different continuation courses that GCE has already

required Plaintiff Wang to pay for.[13]

121.    According to ED's investigation, GCE provided similar proposed cost documents to other prospective students and used those documents to lure students to enroll in doctoral degree programs at Grand Canyon University by falsely representing how much it would cost students to complete their doctoral degrees.

122.    In reliance on the graduation timeline and false and misleading estimated tuition cost and total estimated cost information provided by TS and GCE, Plaintiff Wang decided to enroll in the Doctor of Education program in Organizational Leadership at Grand Canyon University in March 2019. At that time, and throughout her studies at Grand Canyon University, Plaintiff Wang has lived in California.

123.    Between March 2019 and February 2022, Plaintiff Wang was able to complete 17 content courses at GCU and earn 51 credits toward her Doctor of Education degree.

124.    In March 2022, Plaintiff Wang began enrolling in the first of three courses focusing on her dissertation. Policies and practices enacted by GCE, however, caused Plaintiff Wang to encounter innumerable delays in her dissertation process.

125.    During her dissertation process, academic advisors and reviewers repeatedly told Plaintiff Wang to revise and resubmit drafts of sections for review even though those comments and edits could have been addressed more efficiently. Almost every time, the advisors and reviewers did not review Plaintiff Wang's resubmissions promptly and, instead, waited two full weeks before communicating with her.

126.    These repeated delays were exacerbated by the fact that Grand Canyon University's policies require Plaintiff Wang to fulfill nine milestones to complete her dissertation. In connection with each milestone, Plaintiff Wang has encountered artificial bottlenecks and delays describe above. As a result, Plaintiff Wang has had to bear the cost of multiple continuation

---

[13]    While information materials provided by GCE to Plaintiff Wang mentioned continuation courses, those materials never included the cost of continuation courses in either the estimated tuition or the total estimated cost for Plaintiff Wang to complete her doctoral degree.

courses that she was not told about before she enrolled.

127.    In May 2023, GCE required Plaintiff Wang to enroll in her first continuation course, "Research Continuation I." Per policy established by GCE, completion of this continuation course was required for Plaintiff Wang to complete work on his dissertation, in order to earn her doctoral degree.

128.    In September 2023, GCE required Plaintiff Wang to enroll in a second continuation course, "Research Continuation II." Per policy established by GCE, completion of this continuation course was required for Plaintiff Wang to complete work on her dissertation, in order to earn her doctoral degree.

129.    In February 2024, GCE required Plaintiff Wang to enroll in her third continuation course, "Research Continuation III." Per policy established by GCE, completion of this continuation course was required for Plaintiff Wang to complete work on her dissertation, in order to earn her doctoral degree.

130.    In May 2024, GCE required Plaintiff Wang to enroll in her fourth continuation course, "Research Continuation IV." Per policy established by GCE, completion of this continuation course was required for Plaintiff Wang to complete work on her dissertation, in order to earn her doctoral degree.

131.    To date, Plaintiff Wang has had to spend more than $8,700 out of pocket to pay for these four continuation courses and may be required to incur yet more costs before completing her doctoral degree. She had had to incur these costs due to GCE's repeated misrepresentations and omissions regarding the cost required to complete her Doctor of Education degree.

132.    Further, even today, policies and practices enacted by GCE continue to delay Plaintiff Wang's ability to complete her degree and stop paying tuition for continuation courses that she never expected to incur.

## V.    CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

134.    Plaintiffs seek to represent the following classes:

**Nationwide Class**: All persons who enrolled in one of the doctoral programs at Grand Canyon University on or after August 1, 2017.

**California Subclass**:  All persons in California who enrolled in one of the doctoral programs at Grand Canyon University on or after August 1, 2017.

**West Virginia Subclass**:  All persons in California who enrolled in one of the doctoral programs at Grand Canyon University on or after August 1, 2017.

The Nationwide Class, California Subclass, and West Virginia Subclass are all referred to as the "Class" or the "Classes." Members of each of the Classes are referred to, collectively, as "Class Members."

135.    Excluded from the Class are (1) GCE and GCU employees; (2) the judicial officers and the Court staff assigned to this case and their immediate family members.

136.    Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

137.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

138.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. Class Members are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the precise number of Class members is presently unknown, ED data indicates that there are more than 7,000 Class members. The identities of the Class Members—and the members of each Class—may be ascertained from books and records accessible to GCE and GCU.

139.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.    whether GCE devised a fraud scheme to obtain money by means of false or fraudulent representations to prospective GCU students about the true cost of GCU's doctoral programs and the actual number of credits needed to graduate;

b.    whether GCE knowingly executed this fraud scheme;

c.    whether for purposes of executing this fraud scheme, GCE transmitted or caused to be transmitted any writings, signs, or signals by wire in interstate commerce;

d.    whether for purposes of executing this fraud scheme, GCE placed or caused to be placed any matter or thing to be delivered by mail;

e.    whether GCE conducted this fraud scheme leveraging its control over GCU as the RICO enterprise;

f.    whether GCE invested income from its fraud scheme to acquire an interest in Gazelle University for the purpose of establishing a RICO enterprise under the guise of a new, non-profit GCU in 2018;

g.    whether GCE violated section 1962(a) and 1962(c) of RICO;

h.    whether GCE's conduct in connection with its fraud scheme violated California consumer protection statutes;

i.    whether GCE's conduct in connection with its fraud scheme violated the West Virginia Consumer Fraud Statute;

j.    whether Plaintiffs and the Class have been harmed as a result of GCE's fraud scheme; and

k.    whether Plaintiffs and the Class are entitled to equitable or injunctive relief, including but not limited to prohibiting GCE from engaging in the same type

of fraudulent misrepresentations as alleged here, pursuant to 18 U.S.C. § 1964(a).

140.    **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and each of the other Class members first enrolled in a doctoral program at GCU between January 1, 2017, and October 31, 2023, and because Plaintiffs and each of the other Class members were given false or fraudulent representations by GCE concerning the true cost and the actual number of credits needed to complete those doctoral degrees. Plaintiffs and each of the other Class members suffered damages as a direct proximate result of the same wrongful practices in which GCE engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

141.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**. Plaintiffs will fairly and adequately protect the interests of the Classes. By prevailing on their own claims, Plaintiffs will establish GCE's liability to all Class Members. Plaintiffs' counsel are unaware of any conflicts of interest between Plaintiffs as class representatives and absent Class Members with respect to the matters at issue in this litigation. Plaintiffs will vigorously prosecute the suit on behalf of the Classes. Plaintiffs have retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of fraud and consumer protection litigation. Further, Plaintiffs and their counsel are committed to the vigorous prosecution of this action.

142.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**. GCE has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, including but not limited to prohibiting GCE from engaging in the same type of fraudulent misrepresentations as alleged herein, with respect to the Class as a whole.

143.    **Insufficiency of Separate Actions**. Absent a class action, Plaintiffs and Class Members will continue to suffer the harm described herein, for which they would have no

remedy. Even if individual Grand Canyon University doctoral student could bring separate actions, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for GCE.

144.    **Superiority – Federal Rule of Civil Procedure 23(b)(3)**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy for at least the following reasons:

a)    The damages suffered by each individual Class Member do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by GCE's conduct;

b)    Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c)    The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d)    Individual joinder of all Class Members is impracticable;

e)    Absent a class action, Plaintiffs and Class Members will continue to suffer harm as a result of GCE's unlawful conduct; and

f)    This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused by GCE.

145.    In the alternative, the Classes may be certified for the following reasons:

a)    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication concerning individual

members of the Classes, which would establish incompatible standards of conduct for GCE;

b)    Adjudications of claims of the individual Class Members against GCE would, as a practical matter, be dispositive of the interests of other putative Class Members who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

c)    GCE has acted or refused to act on grounds generally applicable to the putative Class Members, thereby making appropriate final and injunctive relief concerning the putative Classes as a whole.

## VI.    CLAIMS ASSERTED

### COUNT I
**USING PROCEEDS OF RACKETEERING ACTIVITY TO ACQUIRE AN INTEREST IN OR TO ESTABLISH A RICO ENTERPRISE IN VIOLATION OF 18 U.S.C. § 1962(a)**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

146.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-145, as though fully set forth herein.

147.    18 U.S.C. § 1962(a) provides, in relevant part:

> "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . ."

148.    At all relevant times, Defendant GCE was a "person" within the meaning of 18 U.S.C. § 1962(c), because it was an "entity capable of holding a legal or beneficial interest in property[.]" *See* 18 U.S.C. § 1961(3)

149.    Between August 2017 and July 2018, as set forth above, *see*, *e.g.*, *supra* ¶¶ 35-81, Defendant GCE received income derived, directly or indirectly, from a pattern of racketing activity, including by engaging in numerous and repeated uses of the mails and interstate wire

communications to execute a scheme to defraud students to enroll in doctoral programs at its subsidiary Old GCU in violation of 18 U.S.C. § 1341 and 1343.

150.    In July 2018, Defendant GCE used or invested part of such income, or proceeds of such income, to acquire an interest in a RICO enterprise—namely, the GCU Enterprise—through Project Gazelle, including by obtaining the Senior Secured Note from GCU.

151.    In July 2018, Defendant GCE also used or invested part of such income or proceeds of such income to establish the operation of the GCU enterprise through Project Gazelle.

152.    Defendant GCE committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341 and 1343, between August 2017 and July 2018.

153.    These multiple acts of racketeering activity that Defendant GCE committed and/or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5).

154.    Defendant GCE's predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

    a)    **Mail Fraud**: GCE violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the scheme to defraud students to enroll in Old GCU's doctoral programs, which amounts to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to, marketing materials, enrollment materials, and invoices sent by GCE to doctoral students at Old GCU.

    b)    **Wire Fraud**: GCE violated 18 U.S.C. § 1343 by transmitting or receiving, or causing to be transmitted or received, materials via wire for the purpose of executing the scheme to defraud students to enroll in Old GCU's doctoral

programs, which amounts to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to, marketing information presented on Old GCU's website, emails to doctoral students at Old GCU, and interstate credit card transactions.

155.    Defendant GCE knowingly and intentionally made misrepresentations concerning the cost of Old GCU's doctoral programs and/or failed to disclose material facts concerning their true cost. GCE either knew or recklessly disregarded that these were material misrepresentations and/or omissions.

156.    Defendant GCE obtained money and property belonging to Plaintiff Wang and other Class members as a result of these violations of 18 U.S.C. §§ 1341 and 1343. Plaintiff Wang and other Class members have been injured in their business or property by GCE's overt acts of mail fraud and wire fraud.

157.    Plaintiffs and other Class members have been injured in their property by reasons of Defendant GCE's violation of 18 U.S.C. § 1962, including the tuition they paid to Old GCU, which collectively amount to tens of millions of dollars, plus interest on their student loans and late fees charged by their credit cards. In the absence of GCE's violation of 18 U.S.C. § 1962, Plaintiffs and the Class would not have incurred those losses.

158.    Plaintiffs other Class members' injuries were directly and proximately caused by Defendant GCE's racketeering activity.

159.    Defendant GCE knew and intended that Plaintiffs and other Class members would rely on the misrepresentations and omissions propagated as part of this scheme to defraud. GCE knew and intended for Plaintiff Wang and the Class to pay excess tuition to Old GCU as a result of this scheme.

160.    Under 18 U.S.C. § 1964(c), Plaintiffs and other Class members are entitled to bring this action and to recover treble damages as well as the cost to bring this action and reasonable attorneys' fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II

### CONDUCTING A RICO ENTERPRISE'S AFFAIRS THROUGH A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. § 1962(C) (ON BEHALF OF THE NATIONWIDE CLASS)

161.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-145, as though fully set forth herein.

162.    18 U.S.C. § 1962(c) provides, in relevant part:

> "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity … ."

163.    During the Class Period, Defendant GCE was a "person" within the meaning of 18 U.S.C. § 1962(c), because it was an "entity capable of holding a legal or beneficial interest in property[.]" *See* 18 U.S.C. § 1961(3)

164.    As set forth above, *see*, *e.g.*, *supra* ¶¶ 35–87, Defendant GCE was associated with a RICO enterprise—namely, the GCU Enterprise—during the Class Period and conducted and participated in the GCU Enterprise's affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), including by engaging in numerous and repeated uses of the mails and interstate wire communications to execute a scheme to defraud students to enroll in doctoral programs at GCU in violation of 18 U.S.C. § 1341 and 1343.

165.    During the Class Period, Defendant GCE established and used the GCU Enterprise through Project Gazelle and used that enterprise to carry out the scheme to defraud and a pattern of racketeering activity, including to defraud students to enroll in doctoral programs at GCU.

166.    Defendant GCE committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341 and 1343, within the past 10 years.

167.    These multiple acts of racketeering activity that Defendant GCE committed and//or aided and abetted in the commission of, were related to each other, pose a threat of continued

racketeering activity, and therefore constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961(5).

168.    Defendant GCE's predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

a)    **Mail Fraud**:  GCE violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the scheme to defraud students to enroll in GCU's doctoral programs, which amounts to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to, marketing materials, enrollment materials, and invoices sent by GCE to doctoral students at GCU.

b)    **Wire Fraud**:  GCE violated 18 U.S.C. § 1343 by transmitting or receiving, or causing to be transmitted or received, materials via wire for the purpose of executing the scheme to defraud students to enroll in GCU's doctoral programs, which amounts to a material scheme to defraud and to obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to, marketing information presented on GCU's website, emails to doctoral students at GCU, and interstate credit card transactions.

169.    Defendant GCE knowingly and intentionally made misrepresentations concerning the cost of GCU's doctoral programs and/or failed to disclose material facts concerning their true cost. GCE either knew or recklessly disregarded that these were material misrepresentations and/or omissions.

170.    Defendant GCE and its associated entity GCU obtained money and property belonging to Plaintiffs and other Class members as a result of these violations of 18 U.S.C. §§ 1341 and 1343. Plaintiffs and other Class members have been injured in their business or property

by GCE's overt acts of mail fraud and wire fraud.

171.    Plaintiffs and other Class members have been injured in their property by reasons of Defendant GCE's violation of 18 U.S.C. § 1962, including the tuition they paid to GCU, which collectively amount to tens of millions of dollars, plus interest on their student loans and late fees charged by their credit cards. In the absence of GCE's violation of 18 U.S.C. § 1962, Plaintiffs and the Class would not have incurred those losses.

172.    Plaintiffs' and other Class members' injuries were directly and proximately caused by Defendant GCE's racketeering activity.

173.    Defendant GCE knew and intended that Plaintiffs and other Class members would rely on the misrepresentations and omissions propagated as part of this scheme to defraud. GCE knew and intended for Plaintiffs and the Class to pay excess tuition to GCU as a result of this scheme.

174.    Under 18 U.S.C. § 1964(c), Plaintiffs and other Class members are entitled to bring this action and to recover treble damages as well as the cost to bring this action and reasonable attorneys' fees.

### COUNT III
#### UNTRUE OR MISLEADING REPRESENTATIONS IN VIOLATION OF CAL. BUS. AND PROF. CODE § 17500
#### (ON BEHALF OF THE CALIFORNIA SUBCLASS)

175.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-145, as though fully set forth herein.

176.    During the class period, Defendant GCE has engaged in, and continues to engage in, and/or has aided and abetted, and continues to aid and abet, acts or practices that constitute violations of Cal. Business and Professions Code § 17500 et seq., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase services relating to the doctoral programs at Grand Canyon University.

177.    GCE's untrue or misleading representations to Plaintiff Wang and other Class members in California include, but are not limited to, affirmative misrepresentations and

omissions concerning the cost of the doctoral degree programs at Grand Canyon University. The misrepresentations and omissions made to Plaintiff Wang on which she relied are set forth above in Paragraphs 169-89.

178.    At the time the misrepresentations and omissions set forth in the preceding Paragraph were made, GCE knew, or by the exercise of reasonable care should have known, that the representations were untrue or misleading.

179.    As a result of GCE's untrue or misleading representations and omissions, Plaintiff Wang and other Class members in California are entitled to an order, pursuant to Cal. Business and Professions Code § 17535, enjoining such future conduct by GCE and such other orders and judgments that may be necessary to provide restitutionary disgorgement of GCE's ill-gotten gains and to restore to any Class member in California all monies paid as a result of GCE's untrue or misleading statements.

**COUNT IV**
**UNFAIR COMPETITION IN VIOLATION OF**
**CAL. BUS. AND PROF. CODE § 17200**
**(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

180.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-174, as though fully set forth herein.

181.    During the class period, Defendant GCE has engaged in, and continues to engage in, and/or has aided and abetted, and continues to aid and abet, business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

182.    The business acts and practices engaged in by GCE that violate the Unfair Competition Law include:

    a)    Providing Plaintiff Wang and Class members in California with untrue, misleading, unreliable, and/or inaccurate information concerning the cost of the doctoral programs at Grand Canyon University; and

b)    Omitting material facts concerning the true cost of the doctoral programs at Grand Canyon University in communications with Plaintiff Wang and Class members in California.

183.    These business acts and practices are unlawful because they violate laws including:

a)    Cal. Business and Professions Code § 17500;

b)    RICO;

c)    34 C.F.R. §§ 688.71-73; and

d)    Federal and state laws and regulations, including those preclude misrepresentations to students and potential students and those governing accreditation standards and disclosures.

184.    These business acts and practices are unfair in that GCE have caused doctoral students like Plaintiff Wang to pay thousands, sometimes tens of thousands, of dollars in unanticipated costs for continuation courses. These acts and practices violate public policy and are also immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

185.    These business acts and practices are fraudulent in that GCE's untrue and misleading representations and omissions regarding the accreditation of their professional graduate degree or certification programs are likely to, and in fact have, deceived the public.

186.    As a result of Defendants' unlawful, unfair, and fraudulent business acts and practices, Plaintiff Wang and the Class members in California are entitled to an order, pursuant to Business and Professions Code § 17203, enjoining such future conduct by GCE and such other orders and judgments that may be necessary to provide restitutionary disgorgement of GCE's ill-gotten gains and to restore to any Class member all monies paid as a result of GCE's conduct.

1

2

<u>**COUNT V**</u>
**VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT**
**CAL. CIVIL CODE § 1750**

3

**(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

4   187.   Plaintiffs reallege and incorporate by reference the allegations contained in

5   Paragraphs 1-145, as though fully set forth herein.

6   188.   GCE has engaged in, and continues to engage in, and has aided and abetted, and

7   continues to aid and abet, practices that violate the Consumer Legal Remedies Act ("CLRA"),

8   Civil Code § 1750 *et seq.*, specifically unfair, deceptive, unlawful, and unconscionable

9   commercial practices in connection with the sale of services to consumers.

10   189.   Plaintiff Wang and other Class members in California are "consumers" as defined

11   by Cal. Civil Code § 1761(d). The doctoral programs promoted and provided by GCE are

12   "services" as defined by Civil Code § 1761(b).

13   190.   The practices engaged in by GCE that violate the CLRA include:

14       a)   Providing Plaintiff Wang and Class members in California with untrue,

15           misleading, unreliable, and/or inaccurate information concerning the cost of

16           the doctoral programs at Grand Canyon University; and

17       b)   Omitting material facts concerning the true cost of the doctoral programs at

18           Grand Canyon University in communications with Plaintiff Wang and Class

19           members in California.

20   *See, e.g.*, Civil Code §§ 1770(a)(2)-(3), (5), (7), (9), (14).

21   191.   As a result of GCE's violations, Plaintiff Wang and other Class members in

22   California suffered ascertainable monetary losses in the form of tuition they paid and/or debts

23   they incurred for GCE's doctoral programs and (including interest), which they would not have

24   incurred but for GCE's unlawful practices.

25   192.   Pursuant to Cal. Civil Code § 1782, on or around June 12, 2024, Plaintiff Wang

26   notified GCE in writing via certified mail, return receipt requested, to GCE's principal places of

27   business, of the particular violations of the CLRA, as set forth in Exhibit 3. In that letter, Plaintiff

28

Wang demanded that GCE rectify the actions described above by providing monetary relief, agreeing to be bound by its legal obligations, and giving notice to all affected customers of its intent to do so. GCE has not complied to date.

### COUNT VI
### UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF W. VA. CODE § 46A–6

### (ON BEHALF OF THE WEST VIRGINIA SUBCLASS)

193.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-145, as though fully set forth herein.

194.    West Virginia Code § 46A-6-104 provides, in relevant part:

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

195.    At all relevant times, Plaintiff Smith and other class members in West Virginia were "consumers" within the meaning of the West Virginia Consumer Protection Law, because they were "a natural person to whom a sale or lease is made in a consumer transaction and a 'consumer transaction' means a sale or lease to a natural person or persons for a personal, family, household or agricultural purpose." *See* W. Va. Code § 46A–6–102(2).

196.    At all relevant times, Defendant GCE engaged in "trade or commerce" within the meaning of the West Virginia Consumer Protection Law because it engaged in the advertising, sale, and distribution of services[14] that affected people of the state of West Virginia. Specifically, GCE marketed and distributed doctoral programs at Grand Canyon University to residents of West Virginia, including Plaintiff Smith and the other class members in West Virginia. *See* W. Va. Code § 46A–6–102(6).

---

[14]    As recognized by the Supreme Court of Appeals of West Virginia,"[c]onsidered in the context of the CCPA, we see that a 'service' includes a peculiar legal right with respect to education . . . *State ex rel. Morrisey v. Diocese of Wheeling-Charleston*, 244 W. Va. 92, 97, 851 S.E.2d 755, 760 (2020) (*citing Mountain State Coll. v. Holsinger*, 230 W. Va. 678, 684, 742 S.E.2d 94, 100 (2013) (describing private college as "seller of education services")).

197.    Defendant GCE has engaged, and continues to engage, in unfair methods of competition and deceptive acts or practices in conducting trade or commerce, as defined in the West Virginia Consumer Protection Law. *See* W. Va. Code § 46A–6-102(7).

198.    The acts and practices engaged in by Defendant GCE that violate the West Virginia Consumer Protection Law include, without limitation:

a)    Providing Plaintiff Smith and other class members in West Virginia with untrue, misleading, unreliable, and/or inaccurate information concerning the cost of doctoral programs at Grand Canyon University; and

b)    Advertising to Plaintiff Smith and other class members in West Virginia regarding the doctoral programs at Grand Canyon University with the intent not to provide this service as advertised.

199.    As a result of Defendant GCE's unfair and deceptive acts or practices, Plaintiff Smith and other class members in West Virginia enrolled in doctoral programs at Grand Canyon University and were required to incur higher tuition costs than Defendant GCE informed them of. These costs incurred amount to an ascertainable loss, as defined in the West Virginia Consumer Protection Law. *See* W. Va. Code § 46A–6-106.

200.    Plaintiff Smith's and other West Virginia class members' ascertainable losses were directly and proximately caused by Defendant GCE's unfair and deceptive acts or practices.

201.    On March 19, 2024, Plaintiff Smith sent correspondence to Defendant GCE, in writing and by certified mail, notifying it of its violations of the West Virginia Consumer Protection Law. At the time of this filing, Defendant GCE has not made a cure offer to Plaintiff Smith.

## VII.  **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs seek entry of judgment against Defendant GCE as follows:

a.  Certifying the Classes as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as Class Counsel;

b.  Ordering Defendant GCE to cease and desist from engaging in any further violation of 18 U.S.C. §§ 1962, 1341, and 1343, including to make any further misrepresentation or material omission concerning the cost of doctoral programs at GCU using mail or the interstate wire system;

c.  Entering judgment against Defendant GCE in an amount equal to three times the amount of damages that the Plaintiffs and the Class to their property by reason of Defendant GCE's violation of 18 U.S.C. §§ 1962(a) and 1962(c);

d.  Awarding injunctive relief as permitted by law or equity;

e.  Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

f.  Awarding pre- and post-judgment interest on any amounts awarded;

g.  Awarding Plaintiffs and the Class all costs of this action, including their reasonable attorneys' fees and expenses, pursuant to 18 U.S.C. § 1964(c); and

h.  Awarding such other and further relief as may be just and proper.

## VIII.  JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:  June 12, 2024

| | |
|---|---|
| _/s/ Adam J. Levitt_<br>ADAM J. LEVITT<br><br>Li Yu*<br>**DiCELLO LEVITT LLP**<br>485 Lexington Avenue, Suite 1001<br>New York, New York 10017<br>Tel. (646) 933-1000<br>lyu@dicellolevitt.com<br><br>Adam J. Levitt (Ariz. Bar. No. 038655)<br>**DiCELLO LEVITT LLP**<br>Ten North Dearborn Street, Sixth Floor<br>Chicago, Illinois 60602<br>Tel. (312) 214-7900<br>alevitt@dicellolevitt.com<br><br>Peter C. Soldato*<br>Joseph Frate*<br>**DiCELLO LEVITT LLP**<br>8160 Norton Parkway<br>Mentor, Ohio 44060<br>Tel. (440) 953-8888<br>psoldato@dicellolevitt.com<br>jfrate@dicellolevitt.com<br><br>***Counsel for Plaintiffs and the Proposed Class*** | Christopher J. Bryant*<br>Eric Rothchild*<br>**NATIONAL STUDENT LEGAL DEFENSE NETWORK**<br>1701 Rhode Island Avenue NW<br>Washington, DC 20036<br>Tel. 202-734-7495<br>Chris@defendstudents.org<br>Eric@defendstudents.org |

*_Pro Hac Vice_ Admission Pending