**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tanner Smith, et al.,<br><br>         Plaintiffs,<br><br>vs.<br><br>Grand Canyon Education Incorporated,<br><br>         Defendant. | No. CV-24-01410-PHX-SPL<br><br>**ORDER** |

Before the Court is Defendant Grand Canyon Education Incorporated's Motion to Dismiss (Doc. 24), Plaintiffs' Response (Doc. 26), and Defendant's Reply (Doc. 27). The Court now rules as follows.[1]

**I.   BACKGROUND**

This suit arises out of alleged misrepresentations about the time and costs required to obtain doctoral degrees at Grand Canyon University ("GCU") in Phoenix, Arizona. Plaintiffs Tanner Smith, Qimin Wang, Sabrina Palmer, and Kimele Carter (collectively, "Plaintiffs"), on behalf of a putative class, allege that Defendant Grand Canyon Education Incorporated ("GCE" or "Defendant"), which performs marketing and recruitment work for GCU, propagated false information to prospective students about doctoral program costs. (Doc. 18 at 2). Plaintiffs are former GCU doctoral students who enrolled in their

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

programs from 2017 to 2019. (*Id.* at 5–6).

Defendant is a for-profit corporation, registered in Delaware with its principal offices in Phoenix. (*Id.* at 6). Defendant obtained GCU, a non-profit university, in February 2004. (*Id.* at 18). Defendant operated GCU as a for-profit institution ("Old GCU") from 2004 to 2018. (*Id.*). In 2014, Defendant began planning to create the "GCU Enterprise" and to turn GCU back into a non-profit entity that would be nominally independent from Defendant GCE via a series of transactions referred to as "Project Gazelle." (*Id.*). Defendant GCE's CEO, Brian Mueller, chartered "a purportedly independent entity called Gazelle University" in 2014. (Doc. 18 at 18). Defendant sold the assets of GCU to Gazelle University in July 2018 for more than $850 million, after which Gazelle University assumed the name Grand Canyon University. (*Id.*). Defendant provided the funding for the sale by loaning Gazelle University the entire purchase price in return for a Senior Secured Note. (*Id.* at 19). Pursuant to this note, Defendant GCE receives approximately $50 million per year in interest payments from the GCU Enterprise, is entitled to a lump-sum repayment of the principal amount in July 2025, and holds a security interest in the properties of the GCU Enterprise. (*Id.*).

Beyond the Senior Secured Note, Plaintiffs allege that Defendant GCE has retained control over GCU's policies and operations via the "Master Services Agreement," under which Defendant is the exclusive provider of various essential services to GCU, including "technology, budgeting analysis, enrollment, marketing, and student support." (*Id.* at 20). In return, GCU pays Defendant 60 percent of its adjusted gross revenue—including revenue from students' tuition and fees—which has resulted in cost increases to GCU and significant financial benefits to Defendant GCE. (*Id.*). Plaintiffs allege that Defendant GCE has maintained control over the key functions of GCU by having its own executives and employees manage and oversee GCU. (Doc. 18 at 21). All told, Plaintiffs set forth that Defendant GCE controlled the marketing and enrollment operations, and that it had a significant financial interest in the increased enrollment of doctoral students at GCU.

To promote this interest and increase enrollment of doctoral students, Plaintiffs

allege that Defendant lied to prospective students that they could obtain doctoral degrees "by paying a total tuition amount equal to 60 or 65 times the cost per credit" and providing tuition cost estimates that significantly understated the true costs to complete their doctoral programs. (*Id.* at 3). Plaintiffs allege that this tuition information was false, and that Defendant knew that since January 2017 that almost none of the doctoral students at GCU completed their degrees with just 60 or 65 credits, in part due to artificial bottlenecks in the doctoral dissertation process. (*Id.* at 3). Specifically, Plaintiffs allege that Defendant's policies required doctoral students to wait for extended periods of time at different "milestones" throughout the dissertation process and prevented students from communicating directly with dissertation reviewer. (*Id.* at 14). While facing delays, students are required to enroll in "continuation courses" in order to maintain enrollment and be eligible to obtain their doctoral degrees. (*Id.*). As a result of these practices, Plaintiffs allege that at least 70 percent of doctoral students were required to pay thousands or tens of thousands of dollars in extra tuition for "continuation courses" in order to complete their degrees. (*Id.* at 3, 15). Defendant allegedly knew of the true program cost and credit information yet failed to inform prospective students of the true estimated costs on its websites, applications, enrollment packets, or enrollment agreements. (Doc. 18 at 15–16).

On June 12, 2024, Plaintiffs filed this suit against Defendant. (Doc. 1). Plaintiffs filed the operative First Amended Complaint ("FAC") on September 20, 2024. (Doc. 18). Plaintiffs allege that they enrolled in their respective doctoral programs at GCU based on the estimated tuition costs provided by Defendant, encountered innumerable delays in the dissertation process due to Defendant's policies and practices, and suffered financial injuries due to enrollment in continuation courses necessary to complete their degrees. (*Id.*). Plaintiffs bring federal RICO claims on behalf of themselves and a putative nationwide class, and they bring various state law claims on behalf of three putative subclasses that include students from California, Florida, and West Virginia. (Doc. 18 at 38).

## II.  LEGAL STANDARD

"To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Rule 8." *Jones v. Mohave Cnty.*, No. CV 11-8093-PCT-JAT, 2012 WL 79882, at *1 (D. Ariz. Jan. 11, 2012); *see also Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 203 (5th Cir. 2016) (Rule 12(b)(6) provides "the one and only method for testing" whether pleading standards set by Rule 8 and 9 have been met); *Hefferman v. Bass*, 467 F.3d 596, 599–600 (7th Cir. 2006) (Rule 12(b)(6) "does not stand alone," but implicates Rules 8 and 9). Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) for two reasons: (1) lack of a cognizable legal theory, or (2) insufficient facts alleged under a cognizable legal theory. *In re Sorrento Therapeutics, Inc. Secs. Litig.*, 97 F.4th 634, 641 (9th Cir. 2024) (citation omitted). A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference" that the moving party is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations in the complaint should be assumed true, and a court should then "determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. Facts should be viewed "in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013). "Nonetheless, the Court does not have to accept as true a legal conclusion couched as a factual allegation." *Jones*, 2012 WL 79882, at *1 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## III.  DISCUSSION

### a.  Evidence Outside the Pleadings

A threshold issue central to Defendant's arguments is whether Defendant can introduce extrinsic evidence at the Motion to Dismiss stage. Specifically, the evidence at issue includes Exhibits A through J, which are the named Plaintiffs' Doctoral Program Calculators, Doctoral Disclaimers Acknowledgement, and Enrollment Agreements. (Docs. 24-1 to 24-10).

Generally, a district court may not consider extrinsic evidence in determining the legal sufficiency of a complaint's allegations under a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). "[I]f a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Because Defendant failed to follow the Federal Rules of Civil Procedure or the Court's local rules for filing a Motion for Summary Judgment, the Court declines to convert the Motion to Dismiss into a Motion for Summary Judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(d) ("If on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56").

A court may consider outside evidence without converting the motion to a summary judgment motion under two circumstances. One, a court may take judicial notice of matters of public record in considering a 12(b)(6) motion. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Two, a court may consider evidence on which the complaint necessarily relies if its authenticity is uncontested under the incorporation by reference doctrine. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013).

Defendant argues that the Court should take judicial notice of the various enrollment agreements and documents, because the FAC necessarily relies on the agreements and their authenticity is uncontested. (Doc. 24-1 at 10). The agreements include statements providing that the tuition estimates were "estimates only" (Doc. 24-2 at 2); noting that "on average, doctoral students who graduated required 5.2 continuation courses to complete their degree" (Doc. 24-4 at 2; 24-2 at 2); and disclosing the pricing of continuation courses (Doc. 24-2 at 2). While it is not inappropriate for the Court to take judicial notice of the documents that include "disclaimers" at this time via the incorporation by reference doctrine, as discussed below, the presence of the disclaimers is inapposite at this time. Thus, while the Court takes notice of the documents and references them in this Order for purposes of addressing Defendant's arguments, the Court finds their contents are

unnecessary to the consideration of Plaintiffs' fraud claims at this time.

### b. RICO Claims

The FAC alleges RICO claims under 18 U.S.C. § 1962(a) and (c). Section 1962(a) makes it unlawful for any person to reinvest income received from a pattern of racketeering activity. 18 U.S.C. § 1962(a). To state a plausible § 1962(c) claim, Plaintiffs must allege that Defendant "participate[d] in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity . . . ." *Eclectic Properties East, LLC v. Marcus & Millichap Co*., 751 F.3d 990, 997 (9th Cir. 2014).

### i. Section 1962(a): Reinvestment Scheme

Defendant argues that Plaintiffs' Count One fails to allege a RICO reinvestment scheme under 18 U.S.C. § 1962(a). (Doc. 24-1 at 14). Section 1962(a) makes it "unlawful for any person who has received any income derived . . . from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest . . . any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of" an enterprise. 18 U.S.C. § 1962(a).

A § 1962(a) plaintiff only has standing for his claim if he has been injured in his business or property by the conduct constituting the violation, which under § 1962(a) refers to the use or investment of racketeering income rather than the racketeering activity itself. *See U.S. Concord, Inc. v. Harris Graphics Corp*., 757 F. Supp. 1053, 1060 (N.D. Cal. 1991) (citing *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 496 (1985)). Thus, a plaintiff must show that a defendant's use or investment of racketeering income was both the but-for cause and proximate cause of a plaintiff's injury. *KLE, Inc. v. Medisca, Inc*., CV 19-1916 PA (JEMX), 2019 WL 4261882, at *5 (C.D. Cal. June 3, 2019). Allegations that a defendant reinvested "proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity [are] insufficient to show proximate causation." *Sybersound Records, Inc. v. UAV Corp*., 517 F.3d 1137, 1149 (9th Cir. 2008). Otherwise, nearly every racketeering act by a corporation would result in a § 1962(a) violation, which would eviscerate the distinction between § 1962(a) and § 1962(c). *Id.* (citing *Westways*

*World Travel v. AMR Corp.*, 182 F.Supp.2d 952, 960–61 (C.D. Cal. 2001)).

Here, Plaintiffs allege that Defendant GCE is liable under § 1962(a) because they reinvested proceeds from racketeering activity—namely, acts of mail and wire fraud to defraud students into enrolling in doctoral programs at its subsidiary Old GCU—in the GCU Enterprise. (Doc. 18 at 43). However, Plaintiffs' allegations assert that they were injured by way of the excess tuition and other costs they had to pay due their reliance on Defendant GCE's fraudulent misrepresentations. (*Id.* at 44). These injuries result from Defendant GCE's alleged racketeering activity—mail and wire fraud—rather than the reinvestment of the income of such racketeering activity. As such, the Court finds that Plaintiffs have not stated a claim upon which relief may be granted pursuant to § 1962(a). However, because additional facts could remedy Plaintiffs' claim, Plaintiffs' Count I will be dismissed with leave to amend. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend a deficient complaint should be freely given "when justice so requires").

### ii. Mail and Wire Fraud: Fraudulent Conduct

To state a RICO claim under § 1962(c), a plaintiff must allege that a defendant committed a "pattern of racketeering activity," which requires allegations of two predicate acts provided under 18 U.S.C. § 1961(1). *Khalid v. Microsoft Corp.*, 409 F. Supp. 3d 1023, 1035 (W.D. Wash. 2019). Here, Plaintiffs allege that Defendant engaged in the predicate acts of mail fraud and wire fraud. (Doc. 18 at 43). Defendant argues in its Motion that Plaintiffs have not alleged facts sufficient to show that Defendant fraudulently misrepresented or failed to disclose information about the cost to obtain doctoral degree programs such to prove mail and wire fraud. (Doc. 24-1 at 9). Instead, Defendant argues that disclaimers included in the documents it disseminated clearly communicated that the average student required additional continuation courses and disclosed the continuation courses' estimated costs. (*Id.* at 10).

Plaintiffs rely on another case in this District, *Federal Trade Commission v. Grand Canyon Education., Inc.*, with nearly identical facts, in which the court declined to decide whether the disclaimers included in the doctoral degree documents precluded a finding that

the assertions were misleading under § 5 of the FTC Act at the motion to dismiss stage. 745 F. Supp. 3d 803, 834 n.15 (D. Ariz. 2024). By contrast, Defendant points to an Eleventh Circuit case in which GCU faced similar allegations of misrepresentations about the doctoral degree program requirements, *Young v. Grand Canyon University, Inc.*, 57 F.4th 861 (11th Cir. 2023). (Doc. 24-1 at 11). In that case, the Eleventh Circuit affirmed dismissal of the plaintiff's (1) breach of contract claim that GCU breached a promise that students will complete doctoral degree programs in 60 credit hours, because the Enrollment Agreement stated that a minimum of 60 hours was required, and (2) the plaintiff's Arizona Consumer Fraud Act claim, because the plaintiff failed to meet the pleading standard under Rule 9(b). 57 F.4th at 875–76. This case concerns claims of mail fraud and wire fraud under the RICO Act, rather than a deceptive practices claim under § 5 of the FTC Act, an Arizona Consumer Fraud Act action, or a breach of contract claim.

"The elements of mail fraud and wire fraud are (1) a scheme to defraud, (2) the use of the mails or wires to further that scheme, and (3) the specific intent to defraud." *Ogdon v. Grand Canyon Univ. Inc.*, No. CV-22-00477-PHX-DLR, 2024 WL 1344455, at *3 (D. Ariz. Mar. 29, 2024) (citations omitted). The Ninth Circuit has held that in RICO actions alleging the predicate acts of mail and wire fraud, plaintifs must satisfy the heightened pleading standard under Rule 9(b). *Martinelli v. Petland, Inc.*, No. CV-09-529-PHX-DGC, 2009 WL 2424655, at *3 (D. Ariz. Aug. 7, 2009). Under Rule 9(b), plaintiffs must "detail with particularity the time, place, and manner of each act of fraud," which typically requires all averments of fraud to "be accompanied by the who, what, when, where, and how of the misconduct charged." *Id.* (citations and quotations omitted).

Here, Plaintiffs allege that Defendant GCE knowingly and intentionally made misrepresentations and omissions about the cost of the doctoral programs in its marketing campaigns and enrollment packets between January 1, 2017 to October 31, 2023—specifically, informing Plaintiffs that they could expect to graduate from the doctoral programs in 60 credits at a specified estimated cost (Doc. 18 at 23, 33, 34, 44) and omitting that a vast majority of doctoral students would be required to spend thousands of additional

dollars on continuation courses. (*Id.* at 16–17, 40). This is sufficient to plead "the who, what, when, where, and how of the misconduct charged." *Martinelli*, 2009 WL 2424655, at *3.

Defendant further argues that because its marketing materials and Enrollment Agreements contained disclaimers that the tuition estimates were merely estimates and that the doctoral programs may require continuation courses, including an explicit disclaimer "that disclosed graduates 'required an average of 5.2 continuation courses . . . at a cost of $1,950 per course (1st 5 courses); $500 per course (6th course and beyond).'" (Doc. 24-1 at 10–11). Because of these disclaimers, Defendant argues that Plaintiffs do not and cannot establish that Defendant made any material misrepresentations or omissions. (*Id.* at 11).

The Court is unconvinced that the disclaimers indisputably prevent Plaintiffs from stating a claim upon which relief may be granted. The Ninth Circuit has recognized that liability for mail fraud can be found even where statements in advertising materials are not literally false if, taken as a whole, they are fraudulently misleading and deceptive. *See United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (citation omitted). Liability can be premised on deceitful statements that involve half-truths, the concealment of material facts, and non-disclosures, as well as affirmative misrepresentations. *Id.*; *see also Kennedy v. Jackson Nat. Life Ins. Co.*, C 07-0371 CW, 2010 WL 4123994, at *7 (N.D. Cal. Oct. 6, 2010). Other relevant considerations include the arrangement of the words or the circumstances in which they are used. *Woods*, 335 F.3d at 998. Additionally, the Supreme Court has "construed the [mail fraud] statute to 'include[ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'" *Neder v. United States*, 527 U.S. 1, 24 (1999).

The Court finds it inappropriate to undertake a fact-intensive analysis of whether the circumstances or arrangement of the words had, as a whole, a fraudulently misleading and deceptive appearance. At the motion to dismiss stage, the Court must construe the facts in the light most favorable to Plaintiffs. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). Thus, the Court will not determine at the pleading stage whether the disclaimers

and other qualifying information contained in the marketing materials and Enrollment Agreements fatally undermine Plaintiffs' allegations of misrepresentations and omissions that form their civil RICO claims.

### iii. Existence of an "Enterprise"

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161(2001)). Under RICO, an enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Defendant argues that Plaintiffs (1) fail to identify what entities comprise the "GCU Enterprise" and (2) fail to identify two distinct entities—a "person" and an "enterprise"—under RICO. (Doc. 24-1 at 12–13).

To restate the relevant facts this Court summarized in the Background section, Plaintiffs allege that the relevant enterprise was created via a series of transactions in 2017 and 2018 called "Project Gazelle." According to the FAC, GCE acquired the assets of Grand Canyon University, which was then operating as a non-profit university, in 2004. (Doc. 18 at 18). Defendant operated GCU as a for-profit educational institution until 2018, when Defendant sold GCU to the "purportedly independent entity" Gazelle University, which was chartered in 2014 by GCE's CEO Brian Mueller, in order to allow GCU to regain its non-profit status. (*Id.*). After the Grand Canyon University assets were transferred to Gazelle, Gazelle adopted the Grand Canyon University name. (*Id.* at 19). Plaintiffs allege that Defendant GCE "controls and dominates GCU's operations and policies" and reaps a large profit from GCU for providing various services. (*Id.* at 20). As such, the Court finds that Plaintiffs have alleged plausible facts that Defendant GCE and GCU are two separate, distinct entities. To that end, the Court finds that Plaintiffs have sufficiently identified Defendant GCE as the RICO "person" alleged in Plaintiffs' FAC.

### iv. Participation in an Enterprise

Defendant further argues that Plaintiffs fail to allege that GCE participated in the GCU Enterprise by directing the enterprise's affairs. (Doc. 24-1 at 13).

"[L]iability for participating in the 'conduct' of a RICO enterprise extends only to those who 'have some part in directing [the enterprise's] affairs.'" *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 910 (C.D. Cal. 2012) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). In this context, "directing" does not necessitate that a defendant be in charge of or have significant control over the enterprise, but it requires more than simply being involved or performing services for the enterprise. *Id.* Relevant considerations include whether the defendant occupied a position in the chain of command, knowingly implemented decisions of upper management, or was indispensable to the achievement of the enterprise's goal. *Walter v. Drayson*, 538 F.3d 1244, 1248–49 (9th Cir. 2008)

Additionally, RICO liability requires a "showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves*, 507 U.S. at 185. Where an entity was hired to provide services and simply performs those services without intending to further a scheme or directing the enterprise's affairs, courts have not assigned liability. *See generally Pac. Recovery Sols. v. United Behavioral Health*, 481 F. Supp. 3d 1011, 1027 (N.D. Cal. 2020); *Borrego Cmty. Health Found. v. Hebets*, 3:22-CV-01056-RBM-SBC, 2025 WL 934451, at *6 (S.D. Cal. Mar. 27, 2025); *Walter*, 538 F.3d at 1247–48 (collecting cases in which attorneys and accountants who merely provided services to enterprises were not liable for the illegal affairs of enterprises when they played no part in directing the enterprises' affairs).

Defendant's Motion argues that it was merely conducting its routine business affairs as a separate entity from the alleged enterprise and thus cannot be held liable for participating in the enterprise. (Doc. 24-1 at 13–14). By contrast, Plaintiff's FAC alleges that Defendant GCE has a direct role in controlling the GCU Enterprise's operations and policies through its Master Services Agreement. (Doc. 18 at 20). Additionally, the FAC

alleges facts that Defendant is the exclusive entity for budgeting analysis, enrollment, marketing, and student support of GCU; has a direct financial interest in the revenue of the enterprise; funded the creation of the GCU enterprise to benefit its own shareholders' financial interests; and has its own executives and employees managing the GCU enterprise's key functions. (*Id.* at 19–21). These facts are not akin to those in cases where participation liability was not found, where the defendants acted essentially as third-party service providers and had no control or involvement in undertaking illegal predicate acts in furtherance of the enterprise's scheme. *See Downey Surgical Clinic, Inc. v. Ingenix, Inc.*, CV 09-5457 PSG (CTX), 2013 WL 12114069, at *13 (C.D. Cal. Mar. 12, 2013) (finding that the existence of a business relationship between the defendants and enterprise was insufficient to show Defendant controlled the other members of the enterprise); *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1210 (C.D. Cal. 2006) ("[I]t is well established that the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself.") (citation and quotation omitted). Thus, the Court finds that Plaintiffs have sufficiently alleged that Defendant is a participant in the GCU Enterprise.

### v. Standing

Defendant argues that Plaintiffs lack standing to bring their RICO claims because they cannot establish proximate cause. (Doc. 24-1 at 15). Defendant argues that Plaintiffs' alleged injuries stem from their own conduct—specifically, their failure to complete their dissertations by the time they had completed 60 hours of coursework, rather than Defendant's alleged misrepresentations or artificial delays for students to complete dissertation requirements. (*Id.* at 15–16). Additionally, Defendant argues that causation is defeated by Plaintiffs' acknowledgement of the disclaimers about the potential for and cost of continuation courses to complete their doctoral degrees. (*Id.*).

Taking the facts of the FAC as true, Plaintiffs have alleged that the misrepresentations and omissions enticed them to enroll at GCU. (Doc. 18 at 47). Plaintiffs

have further sufficiently alleged that as a result of these misrepresentations and omissions, combined with artificial bottlenecks designed to delay Plaintiffs' completion of their degrees, Plaintiffs were required to spend thousands of extra dollars to take continuation courses in order to complete their degrees. (*Id.* at 14, 17–18). As such, Plaintiffs have sufficiently alleged that Defendant's misrepresentations, omissions, and "bottleneck" policies were the proximate cause of their injuries. The Court will not consider factual, context-specific arguments about whether Plaintiffs' own conduct—either in failing to complete their degrees in 60 hours or enrolling despite Defendant's disclaimers—affected the chain of causation at the motion to dismiss stage.

### vi. Statute of Limitations

Defendant also argues that the statute of limitations bars Plaintiffs' claims because the purported misrepresentations were made at the time of their respective enrollments.[2] (Doc. 24-1 at 16). Civil RICO claims are subject to a four-year statute of limitations. *See Pres. Petrified Forrest v. Renzi*, CV-12-08140-PHX-DGC, 2013 WL 530574, at *1 (D. Ariz. Feb. 12, 2013) (citing *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 146 (1987)). "In RICO cases, the statute of limitations begins to run when the plaintiff discovers his injury." *Id.* at *2 (citing *Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996)). "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988).

While there is a question of whether a reasonable person would have viewed the

---

[2] Defendant argues that "[w]here, as here, a party is injured later in time based on a misrepresentation made earlier in time, the Ninth Circuit measures the statute of limitations from the earlier-in-time misrepresentation," citing *Phillips v. Mortgage Electronic Registration Sys*tems, No. CV10-2459-PHX-DGC, 2011 U.S. Dist. LEXIS 12956 (D. Ariz. Feb. 8, 2011). (Doc. 24-1 at 16). *Phillips* clearly provides that the statute of limitations for claims of intentional misrepresentation and Arizona Consumer Fraud Act violations begin to run based on when plaintiffs discover or with reasonable diligence should have discovered the fraud or misrepresentation. *Phillips*, 2011 U.S. Dist. LEXIS 12956, at *3. The Court cautions Defendant against misstating the law in future filings.

13

disclaimers and conducted an investigation that would have led to the discovery of the fraud, at the motion to dismiss stage, the Court finds it inappropriate to engage in this fact-specific consideration of the context and circumstances of the disclaiming statements. Taking the facts included in the FAC as true, Plaintiffs were unaware of Defendant's misrepresentations and omissions until July 2021, when the Plaintiffs first took or paid for continuation courses. (Doc. 27 at 12). As such, the statute of limitations does not warrant dismissal of Plaintiffs' RICO claims at this time.

### c. State Consumer Protection Claims

#### i. California Claims: Deceptive Misrepresentation

Defendant argues that Plaintiffs' California claims fail because Plaintiffs do not allege an actionable misrepresentation or omission due to the disclaimers contained in the marketing and enrollment materials at issue. (Doc. 24-1 at 18–19).

California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. California's False Advertising Law ("FAL") prohibits any "untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17500. A violation of the FAL necessarily violates the UCL's "fraudulent" prong. *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020). Lastly, California's Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770. Courts generally evaluate claims under California's UCL, FAL, and CLRA under the same "reasonable consumer standard." *Li v. Amazon.com Services, LLC*, 751 F. Supp. 3d 1138, 1155 (W.D. Wash. 2024). This standard requires a plaintiff to demonstrate that members of the public are likely to be deceived by the defendant's marketing claims. *Id.* (citing *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 778 (9th Cir. 2024)).

Generally, under California law, whether a business practice is likely to deceive the public is a question of fact inappropriate for decision at the pleading stage. *Li*, 751 F. Supp. 3d at 1155 (citing *Whiteside*, 108 F.4th at 778). "Dismissal at the pleading stage is appropriate only when 'it [is] impossible for the plaintiff to prove that a reasonable

consumer was likely to be deceived.'" *Id.* (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)).

As with Plaintiffs' RICO mail and wire fraud claims above, the Court finds it inappropriate to determine the merits of Plaintiffs' misrepresentation allegations at the motion to dismiss stage. Under California law, misleading half-truths can impose a duty to qualify or explain the allegedly deceptive information given in order to avoid liability. *See Rhodeman v. Ocwen Loan Servicing, LLC*, EDCV182363JGBKKX, 2020 WL 4727289, at *7 (C.D. Cal. July 30, 2020) (collecting cases). Based on the facts alleged in the FAC, there is a possibility that Defendant owed a duty to qualify or explain its statements on estimated tuition costs and hour requirements beyond the disclaimers. Defendant has not demonstrated that it is *impossible* for Plaintiffs to prove that reasonable consumers were likely to be deceived by the statements. Thus, the Court does not find it appropriate to dismiss Plaintiff's California law claims due to a failure to allege an actionable misrepresentation.

### ii. California and West Virginia Claims: Actual Reliance

Defendant also argues that Plaintiffs' California FAL, UCL, and CLRA claims and their West Virginia Consumer Credit and Protection Act ("WVCCPA") claim fail because Plaintiffs' failed to demonstrate actual reliance. (Doc. 24-1 at 19–20). Defendant argues that Plaintiffs cannot demonstrate reliance because Plaintiffs cannot show any misrepresentation that they relied upon. (*Id.* at 20). As the Court has already determined that Plaintiffs have adequately alleged misrepresentations, the Court finds this argument unpersuasive. Dismissal is not warranted on this basis of Plaintiffs' California and West Virginia state law claims.

### iii. California UCL Claims: Unlawful and Unfair Prongs

As noted above, California's UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1089 (N.D. Cal. 2017) (citing Cal. Bus. & Prof. Code § 17200). Each of these three prongs provides a separate and distinct theory of liability. *Id.*

First, Defendant further argues that Plaintiffs' California UCL "unlawful practice" prong claim must be dismissed because Plaintiffs fail to allege a predicate violation of another law. (Doc. 24-1 at 20); *see Hadley*, 243 F. Supp. 3d at 1094 ("Virtually any law—federal, state or local—can serve as a predicate for an action under [the UCL]." (citation omitted)). Specifically, Defendant argues that Plaintiffs have failed to plausibly allege violations of RICO, Title IV, or any other federal or state regulation that could form the basis of their UCL claim. (*Id.*). However, as this Court has already determined that Plaintiff's RICO claims pursuant to 18 U.S.C. § 1962(c) survive the present motion to dismiss, the Court finds that Plaintiffs have sufficiently alleged a predicate violation of another law and, as such, have sufficiently alleged a violation of the UCL's unlawful prong.

Next, Defendant argues that Plaintiffs' UCL claim fails because the business practices they allege satisfy the "unfair" prong entirely overlap with the conduct that constitutes the fraudulent and unlawful prongs, which Plaintiffs failed to sufficiently plead. (Doc. 24-1 at 21). Defendant is correct that district courts within the Ninth Circuit consistently find that "when [a] plaintiff's claim under the unfair prong overlaps entirely with the conduct alleged in the fraudulent and unlawful prongs of the UCL, 'the unfair prong of the UCL cannot survive if the claims under the other two prongs . . . do not survive.'" *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021). However, as the Court found above that Plaintiffs have sufficiently alleged claims for violations of the UCL's unlawful and fraudulent prongs, this argument is unavailing. Thus, the Court does not find it appropriate to grant Defendant's Motion on this basis.

Alternatively, Defendant argues that Plaintiffs' unfair prong claim fails because they "cannot state a claim for a violation of the UCL's 'unfair prong' as its own separate cause of action." (Doc. 24-1 at 21). "Whether conduct is unfair can be determined in one of two ways: (1) by establishing that the conduct offends 'some legislatively declared policy' (the 'tethering' test) or (2) by weighing the utility of the conduct against the harm to the consumer (the 'balancing' test)." *Thomas Mattos, v. Nationstar Mortgage*, *LLC*, 2:24-CV-02508-DJC-DMC, 2025 WL 1263985, at *6 (E.D. Cal. May 1, 2025). "While the

California Supreme Court has rejected the balancing test in favor of the tethering test in competitor suits under the UCL," it has yet to clarify whether the tethering test is the sole standard that should apply to consumer suits, as well. *Id.* Pending resolution of this issue, "the Ninth Circuit has endorsed the use of the balancing test for consumer suits but has in practice reviewed unfairness under both the balancing and tethering tests." *Id.* (citing *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007)).

Here, the Court finds that Plaintiffs plausibly allege an unfair business practice under the "balancing test," and thus it need not reach the tethering test. Plaintiffs allege that Defendant materially misrepresented and omitted information that resulted in them incurring thousands of dollars in unanticipated higher tuition costs. Taking these allegations as true, the harm to Plaintiffs plausibly outweighs any utility to Defendant. The Court will not engage in a deeper analysis of the merits at the motion to dismiss stage and finds dismissal inappropriate on this basis. *See Ryan Collins, et al. v. Conifer Value-Based Care, et al.*, EDCV 24-2265-KK-DTBX, 2025 WL 1140788, at *10 (C.D. Cal. Feb. 28, 2025) ("To the extent Defendants request the Court examine the merits at this stage, dismissing Plaintiffs' claims pursuant to the balancing test is inappropriate at the pleading stage."); *Brooks v. Thomson Reuters Corp.*, 21-CV-01418-EMC, 2021 WL 3621837, at *7 (N.D. Cal. Aug. 16, 2021) (refusing to undergo balancing test analysis on motion to dismiss because the "balancing test requires an in-depth evaluation of the facts that is not suitable for the pleading stage.").

### iv. West Virginia and Florida Claims: Proximate Causation

Lastly, Defendant argues that Plaintiffs' claims under the WVCCPA and Florida's Deceptive and Unfair Trade Practices Act fail because Plaintiffs fail to plead facts sufficient to establish proximate cause—namely, that "but for" Defendant's allegedly deceptive conduct, they would not have incurred higher tuition costs. (Doc. 24-1 at 23). As with Defendant's other proximate cause arguments, at the pleading stage, the Court finds it inappropriate to undertake a fact-intensive review of whether any of the Plaintiffs' own conduct contributed to the delays in obtaining their doctoral degrees. As such, the Court

declines to dismiss Plaintiffs' Florida and West Virginia state law claims on this basis.

### IV. CONCLUSION

All told, "whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Leave to amend a deficient complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). When dismissing for failure to state a claim, "a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quotations omitted).

Here, the Court finds that Plaintiffs have pled facts sufficient to state a plausible claim for relief for all but one of their claims. Specifically, Plaintiffs' Count One, a 18 U.S.C. § 1962(a) RICO claim, fails to allege facts demonstrating that the Plaintiffs were injured from the reinvestment of Defendant's racketeering proceeds, rather than the racketeering activity itself. However, because supplemental facts could remedy Plaintiffs' claim, Plaintiffs will be granted leave to amend Count One. Accordingly,

**IT IS ORDERED** that Defendant Grand Canyon Education Incorporated's Motion to Dismiss (Doc. 24) is **granted** as to Count I and **denied** as to all other claims.

**IT IS FURTHER ORDERED** that Plaintiffs' may file a Second Amended Complaint as to amend their Count I no later than **May 20, 2025**. If Plaintiffs fail to file a Second Amended Complaint by that date, Plaintiffs' Count One will be dismissed with prejudice without further notice.

Dated this 6th day of May, 2025.

Honorable Steven P. Logan
United States District Judge