**WO**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Tanner Smith, et al.,

Plaintiffs,

vs.

Grand Canyon Education Incorporated,

Defendant.

No. CV-24-01410-PHX-SPL

**ORDER**

Before the Court is Plaintiffs Tanner Smith, Qimin Wang, and Sabrina Palmer's ("Plaintiffs") Motion for Class Certification (Doc. 48) and Plaintiffs' sealed supporting Memorandum (Doc. 81). Defendant Grand Canyon Education Incorporated filed a Response (Doc. 60), and Plaintiffs filed a Reply (Doc. 75), along with a sealed exhibit (Doc. 76). Plaintiffs also filed a Supplemental Motion to Certify Class (Doc. 88), and Defendant filed a Response (Doc. 90). The Court now rules as follows.[1]

## I. BACKGROUND

This suit arises out of alleged misrepresentations about the time and costs required to obtain doctoral degrees at Grand Canyon University ("GCU") in Phoenix, Arizona. Plaintiffs on behalf of a putative class, allege that Defendant Grand Canyon Education Incorporated ("GCE" or "Defendant"), which performs marketing and recruitment work

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. See LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

for GCU, propagated false information to prospective students about doctoral program costs. (Doc. 18 at 2). Plaintiffs are former GCU doctoral students who enrolled in their programs from 2017 to 2019. (*Id.* at 5–6).

Defendant is a for-profit corporation, registered in Delaware with its principal offices in Phoenix. (*Id.* at 6). Defendant obtained GCU, a non-profit university, in February 2004. (*Id.* at 18). Defendant operated GCU as a for-profit institution ("Old GCU") from 2004 to 2018. (*Id.*). In 2014, Defendant began planning to create the "GCU Enterprise" and to turn GCU back into a non-profit entity that would be nominally independent from Defendant GCE via a series of transactions referred to as "Project Gazelle." (*Id.*). Defendant GCE's CEO, Brian Mueller, chartered "a purportedly independent entity called Gazelle University" in 2014. (Doc. 18 at 18). Defendant sold the assets of GCU to Gazelle University in July 2018 for more than $850 million, after which Gazelle University assumed the name Grand Canyon University. (*Id.*). Defendant provided the funding for the sale by loaning Gazelle University the entire purchase price in return for a Senior Secured Note. (*Id.* at 19). Pursuant to this note, Defendant GCE receives approximately $50 million per year in interest payments from the GCU Enterprise, is entitled to a lump-sum repayment of the principal amount in July 2025, and holds a security interest in the properties of the GCU Enterprise. (*Id.*).

Beyond the Senior Secured Note, Plaintiffs allege that Defendant GCE has retained control over GCU's policies and operations via the "Master Services Agreement," under which Defendant is the exclusive provider of various essential services to GCU, including "technology, budgeting analysis, enrollment, marketing, and student support." (*Id.* at 20). In return, GCU pays Defendant 60 percent of its adjusted gross revenue—including revenue from students' tuition and fees—which has resulted in cost increases to GCU and significant financial benefits to Defendant GCE. (*Id.*). Plaintiffs allege that Defendant GCE has maintained control over the key functions of GCU by having its own executives and employees manage and oversee GCU. (Doc. 18 at 21). All told, Plaintiffs set forth that Defendant GCE controlled the marketing and

enrollment operations, and that it had a significant financial interest in the increased enrollment of doctoral students at GCU.

To promote this interest and increase enrollment of doctoral students, Plaintiffs allege that Defendant lied to prospective students that they could obtain doctoral degrees "by paying a total tuition amount equal to 60 or 65 times the cost per credit" and providing tuition cost estimates that significantly understated the true costs to complete their doctoral programs. (*Id.* at 3). Plaintiffs allege that this tuition information was false, and that Defendant knew that since January 2017 that almost none of the doctoral students at GCU completed their degrees with just 60 or 65 credits, in part due to artificial bottlenecks in the doctoral dissertation process. (*Id.* at 3). Specifically, Plaintiffs allege that Defendant's policies required doctoral students to wait for extended periods of time at different "milestones" throughout the dissertation process and prevented students from communicating directly with dissertation reviewer. (*Id.* at 14). While facing delays, students are required to enroll in "continuation courses" in order to maintain enrollment and be eligible to obtain their doctoral degrees. (*Id.*). As a result of these practices, Plaintiffs allege that at least 70 percent of doctoral students were required to pay thousands or tens of thousands of dollars in extra tuition for "continuation courses" in order to complete their degrees. (*Id.* at 3, 15). Defendant allegedly knew of the true program cost and credit information yet failed to inform prospective students of the true estimated costs on its websites, applications, enrollment packets, or enrollment agreements. (Doc. 18 at 15–16).

On June 12, 2024, Plaintiffs filed this suit against Defendant. (Doc. 1). Plaintiffs filed the operative First Amended Complaint ("FAC") on September 20, 2024. (Doc. 18). Plaintiffs allege that they enrolled in their respective doctoral programs at GCU based on the estimated tuition costs provided by Defendant, encountered innumerable delays in the dissertation process due to Defendant's policies and practices, and suffered financial injuries due to enrollment in continuation courses necessary to complete their degrees. (*Id.*). Plaintiffs bring federal claims under the Racketeer Influenced and Corrupt

Organizations Act ("RICO") on behalf of themselves and a putative nationwide class, and they bring various state law claims on behalf of three putative subclasses that include students from California, Florida, and West Virginia. (Doc. 18 at 38).

Now, Plaintiffs seek to class certification for three groups, a Proposed Class and two Subclasses. (Doc. 48-1 at 17). Plaintiffs seek to certify a nationwide class for the RICO claim, consisting of: "All persons who (a) enrolled in a doctoral program at Grand Canyon University before November 18, 2023, and (b) paid for one or more continuation courses for that program on or after June 13, 2020" ("the Nationwide Class"). (*Id.*). They also seek to certify a California Subclass for California state law claims consisting of "[a]ll Class members who resided in California when they enrolled in a Grand Canyon University online doctoral program" ("the California Subclass"). (*Id.*). They also seek to certify a Florida Subclass of "[a]ll Class members who resided in Florida when they enrolled in a Grand Canyon University online doctoral program" ("the Florida Subclass"). (*Id.*). Plaintiffs clarify that they no longer seek to certify a West Virigina Subclass. (Doc. 48-1 at 10, n.2).

## II. LEGAL STANDARD

Rule 23(a) of the Federal Rule of Civil Procedure lists four criteria that must be met to certify a class action: (1) numerosity; (2) commonality of law or fact; (3) typicality of the representative plaintiff's claims; and (4) adequacy of representation. A class may only be certified if the court is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). The burden is on the party seeking class certification to show that these elements have been met. *Doninger v. Pac. N.W. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977); *see also Olean Wholesale Grocery Coop., Inc., v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) ("[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."). "Failure to meet any one of the requirements set forth in Rule 23 precludes class certification." *Miller v. Am. Standard Ins. Co. of Wis.*, 759 F. Supp. 2d

1144, 1146 (D. Ariz. 2010).

A plaintiff seeking class certification must "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Likewise, when considering class certification courts must engage in "a rigorous analysis." *Id.* at 350–51 (quoting *Falcon*, 457 U.S. at 161). The Rule 23 analysis may "entail some overlap with the merits of the plaintiff's underlying claim," *id.* at 351, but it "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*; *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) ("Although certification inquiries such as commonality, typicality, and predominance might properly call for some substantive inquiry, the court may not go so far . . . as to judge the validity of these claims." (cleaned up)). In fact, "[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies [Rule 23]." *United Steel*, 593 F.3d at 809 (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)).

## III. DISCUSSION

The Court will address each requirement for class certification under Rule 23 of the Federal Rules of Civil Procedure in turn, keeping in mind that "[t]he underlying merits of the case, while admittedly relevant at the class certification stage, should not overly cloud the Court's certification analysis—the only question presently before the Court is whether the requirements of Rule 23 are met." *In re FibroGen Sec. Litig.*, No. 21-cv-02623-EMC, 2024 WL 1064665, at *4 (N.D. Cal. Mar. 11, 2024).

**1. Rule 23(a)**

a. <u>Numerosity</u>

While no bright-line number exists, numerosity is met when general knowledge and common sense indicate that joining the unnamed plaintiffs would be impracticable. *Horton v. USAA Cas. Ins. Co*., 266 F.R.D. 360, 365 (D. Ariz. 2009). The Supreme Court has suggested that a class of 15 members is too small to meet the numerosity requirement. *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) (citing *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980)). However, 40 or more members has been found to satisfy the numerosity requirement. *See Horton*, 266 F.R.D. at 365.

Here, Plaintiffs allegations meet the standard for numerosity, and Defendants do not appear to contest class certification on the basis of numerosity. Plaintiffs contend that there would be at least 1,000 members in the Class, 140 members in the California Subclass, and 45 members in the Florida Subclass. (Doc. 48-1 at 17). Plaintiffs state that these numbers are "conservative minimums" based on a spreadsheet disclosed by Defendant, "containing information regarding students who enrolled in a GCU doctoral program between June 2018 and February 2025." (*Id.* n.3). Plaintiffs further state that the estimates from the spreadsheet are underinclusive "because (1) it does not include students who enrolled before June 2018 and took continuation courses after June 13, 2020, and (2) it does not reflect students who began taking continuation courses after February 14, 2025." (*Id.*). Plaintiffs estimate that the actual number of students in each class would be about double the numbers gained from the spreadsheet. (*Id.* at 17–18). The Court finds that the numerosity requirement is satisfied based on the current dataset and reasonable estimate.

b. <u>Commonality</u>

To establish commonality, Plaintiff must demonstrate that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The claims must "depend upon a common contention such that determination of its truth or falsity will resolve an

issue that is central to the validity of each claim in one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350) (internal quotations omitted). However, the Ninth Circuit has held that "merely pointing to a pattern of harm, untethered to the defendant's conduct, is insufficient" to prove commonality. *C.R. Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1104 (9th Cir. 2017).

Here, Plaintiff contends that commonality is satisfied because all the class members received "nearly identical" representations from Defendant regarding the cost of their programs during the recruitment and enrollment process, and students who requested more information were provided with the same "average continuation course" disclosure. (Doc. 48-1 at 18). Plaintiffs asserts the following are questions common to the RICO claim: (1) Whether GCE made misrepresentations regarding the full or true cost of completing GCU doctoral programs or failed to disclose material facts concerning their true costs; (2) Whether GCE knew or recklessly disregarded that its representations regarding total program cost were material misrepresentations or omissions; (3) Whether GCE was associated with a RICO enterprise and conducted in that enterprise's affairs through a pattern of racketeering activity; (4) Whether GCE violated 18 U.S.C. § 1341 by sending or causing to be wired materials via U.S. Mail for the purpose of executing a scheme to defraud students to enroll in GCU's doctoral programs; (5) Whether GCE violated 18 U.S.C. § 1343 by transmitting or causing to be transmitted materials via wire for the purpose of executing a scheme to defraud students to enroll in GCU's doctoral programs; (6) Whether GCE obtained money from Proposed Class members as a result of violations of 18 U.S.C. §§ 1341 and 1343. (*Id.* at 18–19).

As to the California and Florida state law claims, Plaintiffs state that common questions surround "how a reasonable consumer would have interpreted the alleged misrepresentation" and "whether this defendant caused the injury." (*Id.* at 19). Plaintiffs state that other questions include "whether GCE made misrepresentations regarding the full or true cost of completing GCU doctoral programs or failed to disclose material facts

concerning their true costs," "whether GCE knew or recklessly disregarded that these were material misrepresentations or omissions," and "whether a reasonable consumer would have considered representations regarding 'total program cost' to be material." (*Id.*). In Response, Defendant argues that "Plaintiffs cannot demonstrate commonality with respect to the consumer protection claims" because resolution of those claims would require "*countless* analyses based on the varying universes of written and oral information Plaintiffs and the class members received." (Doc. 60 at 36–37) (emphasis in original).

The Court finds that the commonality requirement is satisfied here. The common questions of law identified by Plaintiffs would, as Defendant puts it, "drive resolution of the entire case without the need for countless 'mini-trials' of different issues." (Doc. 60 at 36). Specifically, as to the Nationwide RICO claim, the Court finds that the question of whether GCE made misrepresentations regarding the full or true cost of completing GCU doctoral programs or failed to disclose material facts concerning their true costs is a question that will generate an answer common to the class. *See In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.*, 122 F.R.D. 251, 255 (C.D. Cal.) ("The issues of law and fact in making out a RICO violation will generally be common to all Plaintiffs' claims, because Plaintiffs are asserting a single fraudulent scheme by the defendants which injured each plaintiff."). The same is true for the state law-based questions surrounding whether the misrepresentations were misleading. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 972–73 (C.D. Cal. 2015). Accordingly, the Court finds that there is sufficient commonality of questions of law and fact.

c. Typicality

A proposed class satisfies the typicality requirement if the claims of the representative party are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). As long as the representative's claims are "reasonably coextensive with those of absent class members[,] they need not be substantially identical." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.

1998)).

Plaintiffs assert that typicality is met here because Plaintiffs and all proposed class members "enrolled in a GCU doctoral degree program when it was GCE's practice to (1) furnish individuals that it recruited and then enrolled in those programs with nearly identical unadorned and unmodified representations of 'total program cost,' and (2) direct any prospective student (or enrolled student) seeking more information regarding program cost to an 'average continuation course' disclaimer." (Doc. 48-1 at 20). They also assert that they, like all other proposed members, "were required to pay substantially more than" the estimated cost for their degree program. (*Id.*).

Defendants counter that Plaintiffs' claims are not typical of the class because each class member was exposed to different representations about their degree programs, had differing levels of knowledge and awareness about the continuation courses, and communicated with the enrollment counselors to varying degrees, and counselors shared different information with different students based on their needs. (Doc. 60 at 31–34). To illustrate the different experiences, Defendant points out that while Plaintiff Smith spoke with his counselor over the phone up to ten times, Plaintiff Wang never spoke a counselor about the continuation courses. (Doc. 60 at 33).

The Court finds that the typicality requirement is satisfied, even though the class members will have certainly had differing experiences in their communications with the enrollment and recruitment counselors and what materials they reviewed. "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Just Film, Inc. v. Buono*, 874 F.3d 1108, 1116 (9th Cir. 2017) (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016), abrogated on other grounds by *Healy v. Milliman, Inc.*, 164 F.4th 701 (9th Cir. 2026)) (internal quotations omitted). The Court finds that Plaintiffs' claims are typical of those of Nationwide class for the RICO claims, as their experiences are all part of the same alleged pattern. *See Just Film*, 847 F.3d at 1118

("Given the nature of RICO liability, the typicality requirement necessarily focuses on whether [the plaintiff] was injured by the same pattern of racketeering as the other class members."). The Court also finds that the claims are typical of the California and Florida Subclasses. Even though different class members may have received different kinds of information from Defendant's representatives, Plaintiffs' injuries are based on the same conduct alleged by the rest of the class.

Defendant also challenges Plaintiffs Smith and Palmer's typicality for specific reasons. First, Defendant argues that Plaintiff Smith is not typical of the class because he took less than the stated average of 5.2 continuation courses. (Doc. 60 at 34). However, the Court agrees with Plaintiffs that typicality here does not depend on the amount of courses taken. Rather, it relies on Plaintiffs having paid more than the estimated cost of their program.

Second, Defendant asserts that Plaintiff Palmer is not typical because her claim under Florida law is time-barred. (Doc. 60 at 35); *see Ngyuen v. Nissan N. Am., Inc.*, 487 F. Supp. 3d 845, 854 (N.D. Cal. 2020) ("Courts have discussed statute of limitations issues with respect to . . . typicality."). Defendant states that Plaintiff Palmer's claim accrued when she enrolled at GCU and paid for her first class in June 2017." (*Id.* at 35). "FDUTPA claims accrue when the last element constituting the cause of action occurs." *Allen v. Jacksonville Univ.*, No. 3:21-cv-178-MMH-LLL, 2022 WL 17668615, at *5 (M.D. Fla. Dec. 14, 2022).[2] "A plaintiff suffers actual damages under FDUTPA when the plaintiff purchases something different from what he or she was led to believe was being purchased." *Id.* "Therefore, FDUPTA claims accrue on the date the plaintiff purchased the product." *Id.* Plaintiffs argue that the claim did not accrue until Plaintiff Palmer began paying for continuation courses, because the tuition paid "for her first sixty credits was, on Plaintiffs' own theory of the case, what she was told it would be" and "continuation courses was the unexpected unrepresented expense that satisfied the third element of the

---

[2] "The three elements of a FDUTPA claim are a deceptive act or unfair practice, causation, and actual damages." *Id.*

FDUPTA claim." (Doc. 75 at 24).

Here, the price of the continuation courses paid, which was not reflected in estimates provided by Defendant, constitutes the "actual damages." *See PODS Enters., LLC v. U-Haul Intern., Inc.*, 126 F.Supp. 3d 1263, 1286 (M.D. Fla. 2015) (stating that generally, actual damages is "the difference in market value of the product or service in the condition in which it was delivered according to the contract of the parties"). Defendant has not shown that the statute of limitations bars Plaintiff Palmer's FDUPTA claim, and the Court has no reason to determine that Plaintiff Palmer's claims are not typical. For all these reasons, the Court finds that the typicality requirement is satisfied.

d. Adequacy

The class representatives must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy requirement depends on: (1) whether the class representatives and their counsel have any conflicts of interest with other class members; and (2) whether the class representatives and their counsel will prosecute the action vigorously on behalf of the class. *Staton*, 327 F.3d at 957.

Plaintiffs assert that those requirements are met here, and the Court agrees. Plaintiffs assert that there are no conflicts with other class members. (Doc. 48-1 at 21). Indeed, it appears that Plaintiffs' interests are aligned with those of the other class members and no conflicts of interest are apparent to the Court. Next, Plaintiffs assert that they have been actively engaged in the case, including being deposed, producing documents, and keeping up to date with the litigation. (*Id.* at 22). Likewise, counsel has invested time and resources into the case and has a depth of experience in this area of litigation. (*Id.*). Therefore, the Court finds that Plaintiffs will adequately represent the classes.

With the four prerequisites under Rule 23(a) satisfied, the Court may now proceed to its analysis of this class action under Rule 23(b)(3).

///

///

**2. Rule 23(b)(3) Predominance and Superiority**

Plaintiff seeks class certification under Rule 23(b)(3). (Doc. 48-1 at 23). Rule 23(b)(3) permits certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" in light of, among other things, "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) also requires that a class action be superior to other methods for fairly and efficiently adjudicating the controversy.

Predominance is a similar inquiry to commonality, but it requires a heightened showing that facts and issues common to the class predominate over any individual issues that might be present. *Id*. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (quoting Rule 23(b)(3)). Accordingly, the Rule 23(b)(3) predominance inquiry turns on whether Plaintiffs could offer evidence to prove the elements of their claims on a *class-wide*, rather than individualized, basis.

a. Evidence in the Record

At base, Plaintiffs assert that, during the class period, Defendant recruited and enrolled students "by representing a 'total program cost,'" which "omitted the thousands of dollars more that almost every GCU doctoral student was required to pay to graduate." (Doc. 48-1 at 8) (citing Docs. 48-5, 48-6). Plaintiffs provide "Total Program Cost" estimates which were generated by Defendant based on the individual student's information and future course of study. (Docs. 48-5, 48-6, 48-21). They provide a summary of the cost for their program based on credit requirements, university fees, and a student's financial aid. (*Id.*). The estimations both state that, "on average, doctoral

students who graduated required 5.2 continuation courses to complete their doctoral degree." (*Id.*). Likewise, the Enrollment Agreements "contained a representation of a fixed number of 'Total Program Credits' and a corresponding 'Total Program Cost' or 'Total Program Tuition and Fees.'" (Doc. 48-1 at 12); (Doc. 48-19); (Doc. 48-20).

Plaintiffs assert that Defendant knew that "more than 90 percent—and possibly more than 98 percent—of GCU doctoral program graduates" had to take at least one continuation course. (*Id.* at 8). Mr. Berger testified at his deposition that the percent of students who graduated "without needing to take dissertation courses"[3] has "never been more than a single digit" since he was dean. (Doc. 48-4 at 9). Plaintiffs also cite to a declaration submitted by the Department of Education in a Fine Action against Grand Canyon University, which states that "1.2% of GCU's 1,863 doctoral students in attendance between January 2017 and July 2022 and who completed their programs with a dissertation requirement on or before July 2022 were able to complete without taking any continuation courses." (Doc. 48-7 at 5).

Plaintiffs also state that Defendant "restricted what its recruiters were informed of and could say about continuation courses and trained them to rely on an 'average continuation course' disclosure—which did not mention costs—when prospective students asked questions about the program's full cost." (Doc. 48-1 at 9). To support this contention, Plaintiffs cite to several pieces of evidence. First, they provide a slide, presumably from an "All CDS Meeting." (Doc. 48-13). The slide, titled "Dissertation Expectation Setting" includes two bullet points: "Since program inception, on average, doctoral students who graduated required 5.2 continuation courses to complete their doctoral degree," and "We have learners who have done it in 0 continuations. We have learners who have needed 10 continuations." (*Id.* at 3). Plaintiffs also provide a second slide from a "CDS UDC Training" slideshow, also titled "Dissertation Expectation Setting" which includes similar bullet points: "Since program inception, on average,

---

[3] Doctoral students who required additional time to complete their dissertations enrolled in continuation courses. (Doc. 48-4 at 6).

doctoral students who graduated required 5.2 continuation courses to complete their doctoral degree," "We have learners who have done it in 0 continuations. We have learners who have needed 10, 15, 20 continuations," and "You need to be prepared to work 20 hours a week, not just for regular coursework, but also dissertation. The more per week in dissertation, the fast (*sic*) you'll get done." (Doc. 48-24).

Plaintiffs also cite Mr. Berger's deposition testimony stating that he was not aware of training to university counselors that included information about the percentage of doctoral graduates who needed continuation courses to complete their degree program. (Doc. 484 at 26–27). Also, Mr. Berger testified that if a student asked what the total cost of the degree program would be, "[t]hat student would have been provided with that on average they would have needed . . . 5.2 continuation courses." (Doc. 48-4 at 25).

Plaintiffs also provide evidence of Defendant's draft presentation to recruiters in April 2018, which included a statement that only seven percent of doctoral graduates complete their degrees without any continuation courses. (Doc. 48-25). That statistic was not included in later training materials and the percentage was not provided to prospective students. (Doc. 48-1 at 14) (citing Doc. 48-4 at 21 (confirming "it was not on the application," "it was not in the enrollment agreement," "[i]t was not in the net price calculator," "it was not on the website," and "[i]t was not in the Doctoral Disclaimers.")). In addition, there is evidence of Defendant's marketing plans. (Doc. 81 at 25).

Defendant submitted evidence, which is the subject of Plaintiffs' Supplemental Motion (Doc. 88) and Defendant's Supplemental Response (Doc. 90). Defendant submitted four declarations.[4] Two are from counselors, Ashley Armstrong and Dr.

---

[4] Plaintiffs challenge the declarations for several reasons, including stating that they are not corroborated, unspecific, and are "at most, evidence of what two individuals subjectively inferred." (Doc. 88 at 8–9). The Court finds that the declarations are relevant in showing that some counselors provided different information to the prospective students in addition to the representations on the enrollment and cost calculator materials. At this stage, the Court only reaches the merits to the extent necessary to the Rule 23 analysis. Therefore, the significance of these declarations is not to show that some "curative disclosures actually occurred." (*See* Doc. 88 at 9). Rather, it reflects the information that some class members may have received from the school.

TiffanyAnn Lundine, and two are from doctoral graduates, Dr. Melissa Siegel and Dr. Charles Clay. (Doc. 90 at 2). Defendant asserts that the declarants establish "that GCE told at least some prospective doctoral students that the 'vast majority' or 'most' doctoral students need continuation courses. (*Id.* at 3). Declarants Armstrong and Lundine "stated that their consistent practice was to advise . . . that the 'vast majority' of GCU doctoral students require continuation courses." (*Id.*). Declarant Seigal, a doctoral graduate, was told by her counselor that "most students take continuation courses." (*Id.* at 9). Declarant Clay testified that his conversations with his counselor gave him the impression that he "most likely" need to take continuation courses. (*Id.* at 8). Through these declarations, Defendant seeks to show that the information Plaintiffs received was "not universal and that oral communications with counselors differ, thereby confirming that class certification is improper" because the Court will need to analyze individualized experiences. (Doc. 90 at 2–3).

b. California and Florida Subclass Claims

The Court will begin by addressing the claims brought by the California and Florida Subclasses to determine whether individual or common issues predominate those claims.

As to the California Subclass, Plaintiffs bring claims under California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, and California's Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code § 1750. (Doc. 18 at 47–50). California's FAL "makes it unlawful for any business to disseminate any statement 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be

---

Plaintiffs also argue that the declarations cannot "establish by a preponderance that individualized curative disclosures actually occurred." (*Id.* at 8–9). The Court has already explained the significance of the declarations to this analysis. It is also worth highlighting that "*plaintiffs* must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (emphasis added).

untrue or misleading.'" *Makaeff v. Trump Univ.*, LLC, No. 3:10-cv-0940-GPC-WVG, 2014 WL 688164, at *11 (S.D. Cal. Feb. 21, 2014) (citing Cal. Bus. & Prof . Code § 17500). Similarly, California's UCL prohibits "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The CLRA targets "unfair methods of competition and unfair or deceptive acts or practices." Cal Civ. Code § 1770. "Courts generally consider claims under California's [UCL], [FAL], and [CLRA] together" at the class certification stage. *In Re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 982. "Each statute allows plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material." *Id.* at 983. Importantly, "the standard does not require that class members have a uniform understanding of the meaning of the challenged representation," but rather, a plaintiff "must show that members of the public are likely to be deceived." *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 612 (N.D. Cal. 2018) (internal quotations and citations omitted).

As to the Florida Subclass, Plaintiffs bring one claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201. (Doc. 18 at 51). "The FDUTPA declares that unfair or deceptive acts or practices in the conduct of any trade or commerce' are unlawful." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (citing Fla. Stat. Ann. § 501.204(1)). "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Id.* (citation omitted). "This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Id.* (citations omitted). Courts have noted that the California consumer protection statutes and FDUPTA "appear to employ the same causation and reliance standard." *Makaeff*, 2014 WL 688164, at *14.

Defendant argues that the varied oral and written communications class members received creates individual issues that predominate. (Doc. 60 at 13–20). Specifically, they

argue that evidence of oral conversations with counselors will differ from class member to class member, they may have received different information, and that different class members had varying degrees of knowledge about continuation courses due to the information they received or sought out. Defendant asserts that the Court will have to determine "what universe of information any individual class member received or heard," and "whether the challenged representations were misleading in light of those varied universes." (Doc. 60 at 20).

Plaintiffs have provided evidence that Defendant mispresented the likelihood any given doctoral student would require continuation courses through the statement that the average doctoral student who graduated needed 5.2 continuation courses to complete their degree. Plaintiffs have provided evidence showing that enrollment agreements and total cost calculators provided by Defendants included this statistic, with no other qualification about the need for additional continuation courses. In addition, there is deposition testimony stating that if a student asked what the total cost would be, they would be told this statistic. Plaintiffs have also provided evidence that Defendant knew that the vast majority of doctoral students, upwards of 90%, would need to take a continuation course to complete their dissertation. On the other hand, the declarations submitted by Defendants indicate that many prospective students may have been informed that the majority of students do require continuation courses or that they would likely need continuation courses through their conversations with counselors.

Defendants also argue that deception, reliance, and materiality must be determined individually because Plaintiffs have not presented common evidence that any prospective student was likely to be misled. (Doc. 60 at 21–22). Thus, they assert that a classwide presumption of reliance is improper. (*Id.*). Within the realm of consumer fraud class actions, the Ninth Circuit has clarified that class certification is appropriate where "a standard sales pitch is employed," because when oral misrepresentations are at issue, they need not be identical. *In Re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006). However, though "minor deviations in the wording of misrepresentations might

not be fatal to class certification," it is "critical that the misrepresentation in question be made to all of the class members." *Rogers v. Epsom Am., Inc.*, 648 Fed. App'x. 717, 719 (9th Cir. 2016).

The Court finds that Plaintiffs have not met their burden supporting predominance. (Doc. 48-1 at 26). Based on the evidence, it appears that Defendant disseminated uniform statements about the average number of continuation courses required and provided enrollment and application materials also reflecting that statement to prospective doctoral students. There is also evidence that prospective students believed the quoted cost estimate, which excluded the cost of the continuation courses, would be the total cost. (Doc. 48-1 at 26). But there is also evidence of individual-level conversations. It appears that certain counselors told prospective students that a vast majority of students would need to take the continuation courses and that some students, through their conversations with counselors, knew that most students would be required to take such courses. (Docs. 60-17, 60-18, 60-19, 60-20). Some counselors did not provide this information. (Doc. 76). In light of all this evidence, Plaintiffs and prospective class members received a wide variety of different representations through their varying levels of communication with counselors surrounding the likelihood that they would need to take continuation courses. Because different representations were made to different class members, it cannot be said that the class is sufficiently cohesive to warrant adjudication by representation. *C.f. Makaeff*, 2014 WL 688164, at *13 ("The effect of this campaign was to make it highly likely that each member of the putative class was exposed to the same misrepresentations.").

Accordingly, the Court finds that because prospective students received varying information throughout the enrollment process, individual issues predominate the alleged violations of California and Florida consumer protection laws. In addition, because "each class member has to litigate numerous and substantial separate issues," class action is not superior. *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1192 (9th Cir. 2001). Therefore, the Court will deny the Motion for Class Certification as to the Subclasses.

The Court will next consider whether common issues predominate as to the RICO claims.

c. Nationwide Class Claims

Plaintiffs allege a RICO violation based on 18 U.S.C. §1962(c). (Doc. 18 at 45–47). "To establish a civil RICO claim, a plaintiff must establish: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citing *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)). Plaintiffs allege the predicate acts of mail fraud and wire fraud used to "defraud students to enroll in doctoral programs." (Doc. 18 at 45, ¶ 207). "RICO requires a showing of 'but for' and proximate cause." *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (citations omitted). "RICO's causation requirement is also expressed through the legal element of reliance." *Id.* (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008); *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259–60 (9th Cir. 2019)).

The parties dispute whether Defendant's misrepresentations were the cause of the harm to Plaintiffs. Plaintiffs assert that they can establish proximate cause without a showing of reliance because their injury is the "direct result" of Defendant's fraud. (Doc. 48-1 at 28). They state that class plaintiffs asserting mail fraud claims under RICO may "use a common inference of reliance to prove proximate causation" when the evidence allows. (Doc. 75 at 16). The Ninth Circuit has explained that a "common sense inference of reliance—or a common sense inference of causation (reliance being one way to prove causation)" may be appropriate when the "only logical explanation for such behavior is that the class members relied on defendants' representation." *White*, 104 F.4th at 1196–97 (citation omitted). It is inappropriate when "unique facts surrounding the class claims . . . involve significant individualized or idiosyncratic elements that reasonably preclude the predomination of common questions." *Id.* (citing *CGC Holding Co. v. Broad and Cassel*, 773 F.3d 1076, 1092 (10th Cir. 2014)).

Defendant asserts that it will provide individualized evidence regarding class members' "aware[ness] at enrollment that *most* or the *vast majority* of doctoral students needed continuation courses, yet proceeded to enroll and continued with their programs despite this knowledge."[5] (Doc. 60 at 25) (emphasis in original). There are important questions surrounding what information prospective students knew about the continuation courses, including whether they were told that the majority of doctoral students needed to enroll in continuation courses to graduate.

Like in *White*, some of the enrollment and recruitment materials provided to prospective students were "standardized," but based on the record before the Court, it appears that the enrollment process "became more individualized to [the prospective student] as it went along, through communications with counselors. *White*, 104 F.4th at 1188. Because Defendant "communicated with each [student] individually, through ways other than" the standard materials, the "course of interactions" alleged as fraudulent here "was a good deal more varied than they indicate." *Id.* at 1194. Plaintiffs have not shown that the communications were so "uniform" that common questions predominate. *Id.* Therefore, the Court finds that significant individualized issues of causation predominate, and "the complexities of class action treatment outweigh the benefits of considering common issues in one trial," so class action is not superior. *Zinser*, 253 F.3d at 1192. The Rule 23(b)(3) requirements are also not satisfied as to the RICO claim.

## IV. CONCLUSION

The Court concludes that the Rule 23(a) factors are satisfied, but the more rigorous Rule 23(b)(3) requirements are not. Plaintiffs have failed to demonstrate that questions of

---

[5] Defendant argues that "Plaintiffs and the putative class cannot attribute their harm to GCE if their own actions or personal circumstances delayed the research, writing, review, and approval of the dissertations necessary to complete their doctoral programs, and thus, caused them to pay for continuation courses." (Doc. 60 at 29). The Court does not find this argument availing because Plaintiffs' theory of causation is "focused on misleading statements and material omissions that induced enrollment, rather than post-enrollment developments." (Doc. 75 at 18). However, for the reasons stated in the analysis above, the Court still finds that individualized questions regarding causation predominate.

law or fact common to class members predominate over any individual questions for all of the claims and proposed classes and that a class action is superior. Because the Court does not find that common issues predominate for the Nationwide Class or the Subclasses, the Motion for Class Certification will be denied.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Class Certification Pursuant to FRCP 23(a) and 23(b)(3) (Doc. 48) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiffs' Supplemental Motion for Class Certification (Doc. 88) is **denied**.

Dated this 11th day of September, 2026.

Honorable Steven P. Logan
United States District Judge